IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 17-cr-00168-CMA

UNITED STATES OF AMERICA

   Plaintiff,

v.

1. KAREN LYNN MCCLAFLIN,

   Defendant,

## PLEA AGREEMENT AND STATEMENT OF FACTS RELEVANT TO SENTENCING

The United States of America, by and through Pegeen D. Rhyne, Assistant United States Attorney for the United States Attorney's Office for the District of Colorado (the "government"), and the defendant, Karen Lynn McClaflin ("McClaflin" or the "defendant"), personally and by counsel, Thomas J. Hammond, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

### I.   AGREEMENT

1.   The defendant agrees to plead guilty to Counts 1 and 2 of an Information, charging one count of violating 18 U.S.C. § 1343, wire fraud, and one count of violating 18 U.S.C. § 1957, engaging in monetary transactions in property derived from wire fraud, respectively.  The defendant further agrees to admit to asset forfeiture allegations in the Information.  The defendant further agrees to file a Waiver of Indictment at the time of her

COURT EXHIBIT 1

initial appearance in this case.

2.	The defendant agrees to pay the $200 special monetary assessment applicable to these counts at or before the time of sentencing.

3.	The defendant agrees that her sentence will include an order of restitution in the amount of up to $20,000,000.

4.	Provided that the defendant does nothing inconsistent with acceptance of responsibility between the date of the change of plea hearing and the date of the sentencing hearing, the government agrees that the defendant shall be awarded the full reduction for acceptance of responsibility, pursuant to Section 3E1.1(b) of the Sentencing Guidelines, at the time of sentencing if the defendant's adjusted offense level is at least 16.

5.	The defendant reserves the right to request a variant sentence.

6.	The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined.   Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statute of conviction; (2) the sentence exceeds the advisory guideline range that applies to a total offense level of 27; or (3) the government appeals the sentence imposed.   If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this

2

prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct.

8.  **Forfeiture of Assets:** The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture as proceeds of the scheme set forth in the indictment, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(a)(1), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees, or elsewhere. The assets to be forfeited specifically include, but are not limited to: a money judgment in an amount of up to $20,000,000.[1] The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis to establish that the requisite nexus exists between the specific property subject to forfeiture and the offenses to which

---

[1] A receiver has been appointed to Homesource Partners Inc., which was the company through which the defendant ran her fraud. The receiver is working to identify and liquidate assets of Homesource Partners Inc. in order to return money to the victims. The government agrees that any payments made by the receiver to the victims in this case should offset any restitution order imposed in this case.

defendant is pleading guilty. Pursuant to the provisions of Rule 32.2(b)(1), the United States and the defendant request that at the time of accepting this plea agreement, the Court find that the government has established the requisite nexus and enter a preliminary order of forfeiture.

The defendant agrees fully to assist the government in the recovery and return to the United States of any assets, or portions thereof, that are subject to forfeiture wherever located. The defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control and those which are held or controlled by a nominee.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture. The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offense, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws. The defendant understands that the United States Attorney's Office has authority only to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

8.   This plea agreement is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure.

## II. ELEMENTS OF THE OFFENSE

9. The parties agree that the elements of wire fraud offense in Count 1 of the Information to which this plea is being tendered are as follows:

   A. The defendant devised a scheme to defraud or to obtain money by means of false or fraudulent pretenses, representations or promises;

   B. The defendant acted with specific intent to defraud or to obtain money by means of false or fraudulent pretenses, representations or promises;

   C. The defendant used, or caused another person to use, interstate wire communications facilities for the purpose of carrying out the scheme; and

   D. The scheme employed false or fraudulent pretenses, representations, or promises that were material.[2]

10. The parties agree that the elements of the offense in Count 2 of the Information of engaging in a monetary transaction in property derived from wire fraud to which this plea is being tendered are as follows:

   A. The defendant engaged in a monetary transaction affecting interstate commerce.

   B. The monetary transaction was conducted involving criminally derived property.

   C. The value of the criminally derived property exceeded $10,000.

   D. The defendant knew the transaction involved criminally derived property.

   E. The monetary transaction took place within the United States.[3]

## III. STATUTORY PENALTIES

---

[2] Tenth Circuit Pattern Jury Instructions (Criminal Cases), 2011, § 2.57.
[3] In the absence of a Tenth Circuit Pattern Jury Instruction for this statute, these elements were found in Federal Jury Practice and Instructions, 6th Cir., 2013, § 11.06.

5

11. The maximum statutory penalty for a violation of 18 U.S.C. § 1343 is: not more than 20 years of imprisonment, a fine of not more than the greater of $250,000 or twice the gain or loss from the offense, or both; not more than 3 years of supervised release; a $100 special assessment fee; plus up to $20,000,000 in restitution.

The maximum statutory penalty for a violation of 18 U.S.C. § 1957 is: 10 years of imprisonment; a fine of not more than the greater of $250,000 or twice the amount of the criminally derived property, or both; 3 years supervised release, and a $100 special assessment fee.

Accordingly, the total maximum statutory penalty for both Counts 1 and 2 of the Information is: not more than 30 years of imprisonment; a fine of not more than the greater of $250,000 or twice the gain or loss from the offense plus a fine of not more than the greater of $250,000 or twice the amount of the criminally derived property, or both; not more than 3 years of supervised release; a $200 special assessment fee; plus up to $20,000,000 in restitution.

12. If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV.   COLLATERAL CONSEQUENCES

13. The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.   STIPULATION OF FACTS

14. The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement. That basis is set forth below.

Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

15. This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

16. The parties agree that the month in which relevant conduct began is March 2011.

17. The parties agree as follows:

### Wire Fraud- Count 1

In approximately December 2005, McClaflin and a partner opened a franchise of "We Buy Ugly Houses" named Trademark Properties and Trademark Reality ("Trademark") in Colorado Springs. Trademark's business model was to use investor money to purchase and renovate distressed houses in order to resell those houses at a profit (hereinafter "fix and flip"). By 2011, Trademark had accumulated so much debt that McClaflin's partner declared bankruptcy and their partnership was terminated. Rather than declare bankruptcy herself, McClaflin transitioned to another company with the same "fix and flip" business model as Trademark.

In late 2010, McClaflin started Homesource Partners Inc. ("Homesource"), and

7

McClafflin rolled her investors from Trademark into Homesource. From late 2010 through early March 2017, McClaflin owned and operated Homesource in Colorado Springs, Colorado.

In seeking investors for Homesource between March 2011 and early 2017, McClaflin told investors, potential investors, and intermediaries representing investors that Homesource was seeking loans from investors to finance Homesource's "fix and flip" business because Homesource was not able to use traditional bank loans. McClaflin represented that traditional bank loans took too long and some of the distressed homes might not qualify as collateral for such loans.

From March 2011-early 2017, through Homesource marketing materials and verbal statements, McClaflin represented to investors, potential investors and intermediaries representing investors that Homesource had access to distressed houses that were deeply discounted which Homesource could purchase for no more than 80% of the "as is" value of the house. McClaflin further represented that Homesource then had the following three exit strategies to profit from the distressed house: (1) sell it within 30 days for an immediate profit; (2) "fix and flip" the house for sale within 31-90 days; or (3) fix the house and rent it if the house fails to sell within 90 days. McClaflin represented that Homesource had a team of contractors who would fix and upgrade the properties so Homesource could resell the properties for a profit. McClaflin further represented that each property would be financed by an individual investor whose investment would be secured by a Deed of Trust in first position on that property, which McClaflin would record for the investor. Occasionally, McClafflin told the investor their Deed of Trust would be in second position. The investor's principal investment would be returned to the investor

8

upon the sale of the property. McClaflin further represented that investors would receive an interest rate of 6% to 15%. McClaflin represented that the properties would normally be sold in 3 months. McClaflin made the above-described sales pitch many times, including at an Accredited Members, Inc. conference March 2011 and at an economic forum hosted at the Broadmoor Hotel in Colorado Springs in 2013.

However, starting in late March 2011, McClaflin knowingly and intentionally began having multiple investors "invest" in the same property and began placing multiple Deeds of Trust on the same properties such that the amount of the investments purporting to be secured by the Deeds of Trust exceeded the value of the property. Additionally, starting in late March or April 2011, McClaflin intentionally did not record all of the investors' Deeds of Trust as promised. Nonetheless, McClaflin continued to falsely represent that investors would receive a first Deed of Trust and that McClaflin would record that Deed of Trust for the investor. McClaflin also sometimes forged the signature of an investor, without the investor's knowledge or consent, on a release so McClaflin could remove that investor's Deed of Trust from a property. McClaflin sometimes did not inform investors when "their" property sold and did not return the investor's principal upon that sale as promised.

Additionally, starting in at least the beginning of 2013, Homesource's debt had grown too high and the interest payments owed to investors far exceeded the gross profits earned by Homesource. By at least January 2013, McClafflin was aware of this problem and intentionally continued seeking additional investments so that she could keep making the interest payments owed to earlier investors.

Moreover, based on a request in late 2014 from Investment Firm A, which

represented a number of investors, McClaflin agreed to provide to Investment Firm A's investors the following: (1) a Lien Summary Report for the property in which the investor intended to invest dated prior to the investment; (2) a sworn affidavit from McClaflin stating that she would use the invested funds to refinance any existing liens on that property; and (3) a second Lien Summary Report showing the investor holding a lien in first position on that property.   From at least September 2015 through December 2016, McClaflin provided many of these investors with sworn affidavits that falsely stated she would use the investor's money to refinance the existing liens on the specific property when McClaflin knew that she was using the majority of new investor money to make interest payments to other investors rather than using it to pay off the existing lien holders on properties.   From at least September 2015 through December 2016, McClaflin also altered many of the "second" Lien Summary Report so that it would falsely show the new investor holding a lien in first position on the property.

Unbeknownst to the individual investors, the amount of investment funds, which were supposed to be secured by real property, far exceeded the value of the encumbered property and Homesource's business assets.   An analysis of the Homesource's finances shows that the influx of investor funds kept Homesource operating, particularly in its latter years, and without investor funding, Homesource would have failed years ago.

In 2016, T.B. and L.B. were a married couple who were investors who had heard of Homesource through Investment Firm A.   Representatives of Investment Firm A communicated to T.B. and L.B. the false statements made by McClalfin set forth above, including that T.B. and L.B. would receive a Deed of Trust in first position on the property in which they were investing and that their investment would be used to pay off prior liens

on that property. On September 1, 2016, for the purpose of investing in Homesource's business, investors T.B. and L.B. wired $100,000 from their joint Charles Schwab brokerage account in California to Homesource Partners Inc.'s ENT Credit Union account # xx3200 located in Colorado Springs, Colorado.

### Engaging In Monetary Transaction with Proceeds from Wire Fraud-Count 2

On September 2, 2016, MCCLAFLIN transferred $40,857.12 from Homesource Partners Inc.'s Ent Credit Union account # xx3200 to Ent Credit Union account # xx2662 held in defendant MCCLAFLIN's name. At the time of this transfer, the $100,000 deposit wired in from investors T.B. and L.B. on September 1, 2016, which was proceeds from the wire fraud scheme described above, remained in Homesource Partners Inc.'s ENT Credit Union account # xx3200. At the time of the transfer, ENT Credit Union's accounts were insured by the National Credit Union Share Insurance Fund. Additionally, throughout September 2016, Ent Credit Union engaged in interstate financial transactions for the benefit of its customers.

## VI. ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

18. The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations,

the recitation below identifies in bold the matters which are in dispute, if any.

### Wire Fraud

A. The base guideline is § 2B1.1, with a base offense level of 7.

B. A 20-level enhancement applies because the loss was more than $9,500,000 but less than $25,000,000. §2B1.1(b)(1)(K). **The defendant reserves the right to oppose this enhancement.**

C. A 2-level enhancement applies because there were more than 10 victims. §2B1.1(b)(2)(A)(i).

D. A 2-level enhancement applies because the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions. §2B1.1(b)(16)(A). **The defendant reserves the right to oppose this enhancement.**

E. The adjusted offense level would be 31.

### Monetary Transaction in Proceeds from Mail Fraud

F. The base guideline is § 2S1.1, with a base offense level of 31 (offense level for the wire fraud offense from which the laundered funds were derived). § 2S1.1(a)(1).

G. A 1-level enhancement applies because the defendant was convicted of 18 U.S.C. § 1957. § 2S1.1(b)(2)(A).

H. The adjusted offense level would be 32.

I. Provided that the defendant does nothing inconsistent with acceptance of responsibility between the date of the change of plea hearing and the date of the sentencing hearing, the defendant

should receive a 3-level downward adjustment for timely acceptance of responsibility. The resulting offense level would be 29.

J.  The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

K.  The career offender/criminal livelihood/armed career criminal adjustments would not apply.

L.  The advisory guideline range resulting from these calculations is 87-108 months for Criminal History Category I. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from 87 months (bottom of Category I) to 188 months (top of Category VI). The guideline range would not exceed, in any case, the statutory maximum applicable to the counts of conviction.

M.  Pursuant to guideline § 5E1.2, assuming the estimated offense level above, the fine range for this offense would be $30,000 to $300,000, plus applicable interest and penalties.

N.  Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least 1 year, but not more than 3 years.

    O. Pursuant to guideline §5E1.1(a)(1), the Court shall enter a restitution order for the full amount of the victim's loss, which the parties agree will be an amount of up to $ 20,000,000.

19. The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

20. No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

21. The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. ENTIRE AGREEMENT

22. This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

6-21-17
Date

KAREN LYNN McCLAFLIN
Defendant

6-21-17
Date

THOMAS J. HAMMOND
Attorney for Defendant

6/21/17
Date

PEGEEN D. RHYNE
Assistant U.S. Attorney

15