## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 17-cr-00168-CMA


**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**KAREN LYNNE MCCLAFLIN,**

**Defendant.**

_____

### REPORTER'S TRANSCRIPT
### (Sentencing Hearing)
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 11:04 a.m. on the 10th
day of May, 2018, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

### A P P E A R A N C E S

**FOR THE PLAINTIFF:**
PEGEEN D. RHYNE and LAURA B. HURD, U.S. Attorney's Office
- Denver, 1801 California St., Suite 1600, Denver, CO
80202

**FOR THE DEFENDANT:**
THOMAS J. HAMMOND, Attorney at Law, 1544 Race St., Denver,
CO 80206

<u>**I N D E X**</u>

<u>**WITNESSES**</u>:                                                      <u>**PAGE**</u>

**MELISSA TWEET**
DIRECT EXAMINATION BY MS. RHYNE                          40
CROSS-EXAMINATION BY MR. HAMMOND                         44
REDIRECT EXAMINATION BY MS. RHYNE                        47


**JAMES BARASH**
DIRECT EXAMINATION BY MR. HAMMOND                        50
CROSS-EXAMINATION BY MS. RHYNE                           64

<u>**E X H I B I T S**</u>

<u>**NO.**</u>                                                        <u>**ADMITTED**</u>

    1, 2   ........................................    44


<u>**No.**</u>                                                        <u>**REFUSED**</u>

           ........................................

1          **MAY 10, 2018**

2          (Proceedings commence at 11:04 a.m.)

3          THE COURT:  You may be seated.

4          Court calls Criminal Case No. 17-cr-00168-CMA,

5    encaptioned the United States of America v. Karen Lynne

6    McClaflin.

7          Counsel, would you please enter your appearances.

8          MS. RHYNE:  Good morning, Your Honor, Pegeen Rhyne

9    and Laura Hurd for the United States.  With us at counsel

10   table is Special Agent Melissa Tweet, of the IRS.

11         THE COURT:  Good morning.

12         MR. HAMMOND:  Good morning, Your Honor, I am Tom

13   Hammond.  With me at counsel table is Matthew Werner.  He

14   represents Ms. McClaflin in the civil collections suit, as

15   well.  Ms. McClaflin is present.  She is seated to my

16   right.  She is on, I believe, a summons, or it is a

17   personal recognizance bond.

18         THE COURT:  Okay.  All right.  For the record, the

19   Court also notes that Officer Michelle Means, representing

20   the United States Probation Office, is also in attendance

21   at this hearing.  Good morning.

22         PROBATION OFFICER:  Good morning, Your Honor.

23         THE COURT:  Mr. Hammond, would you and

24   Ms. McClaflin please approach the podium.  The record

25   shows that on June 21, 2017, pursuant to a plea agreement,

1    Ms. McClaflin entered a plea of guilty to and was

2    convicted of two counts in an Information, the first

3    charged violation of 18 United States Code Section 1343;

4    wire fraud, and a second charged violation of 18 United

5    States Code Section 1957; money laundering.

6         We are here today for sentencing.  I have received

7    and reviewed the full presentence investigation report,

8    including on -- dated February 5, 2018, as revised on

9    March 5, 2018, including all addenda thereto, especially

10   the victim impact statements.

11        I also reviewed Document No. 18, the defendant's

12   objections to the presentence report.

13        26, the defendant's doctor's letter.

14        17, the Government's objection to the presentence

15   report.

16        19, the Government's motion for a 3-level decrease

17   in offense level for acceptance of responsibility.

18        15, the stipulation of loss and restitution.

19        And, 20, the Government's motion for a variant

20   sentence of 65 months.

21        Are there any documents that I failed to identify

22   that I should have reviewed in preparation for this

23   hearing?

24        MS. RHYNE:  No, Your Honor.

25        MR. HAMMOND:  Yes, but I haven't been able to

1   provide them to the Court.

2       THE COURT:  If you don't provide them to me before

3   the hearing, I don't get to review them, do I?

4       MR. HAMMOND:  That's correct, Your Honor.  That may

5   be an issue for another hearing that I'm the subject of,

6   and that is something that I will shoulder.

7       I think that there are a couple things that the

8   Court -- a couple documents that the Court should have.  I

9   have been late in getting some of those.  I have been late

10  in putting some of that together.  Some of it I have had

11  for awhile, some of it not so long.

12      The -- and I just need to put this into

13  perspective.  May I have just a second?  I think you know

14  me well enough after all of these years, I tend to get

15  choked up on certain occasions, and this is certainly one

16  of the biggest.

17      The course of this case seems to be prolonged, but

18  I submit to the Court that it is not.  Ms. McClaflin was

19  operating her business in, I believe it was March of 2017.

20  She was confronted.  She admitted.  We -- the Government

21  contacted me and Mr. Werner, and what happened was we

22  pretty much came to a very quick resolution by virtue of

23  an Information, not an Indictment.

24      There was a plea, I believe, in a week, and we all

25  agreed that it was necessary to continue the case for an

1    extended period of time for sentencing because of the role

2    that Ms. McClaflin was playing, and continues to play,

3    with the Receiver in this case, who is -- has, as I

4    understand it, I believe it is around $6.5 million in a

5    trust account that should be going to the named victims in

6    this case.

7          There is more than that.  And I can't -- I want to

8    show the Court, and I would have liked to have provided

9    the Receiver's plan of distribution.  It does not -- I am

10   going to go through this, if we have to go to the

11   sentencing, with one of the witnesses today; why there is

12   no date set certain that the current amount, the current

13   pot of money cannot be distributed at this point in time.

14         I wanted to also provide the Court with some

15   additional information, and I will do that as well as I

16   can.  Ms. McClaflin did two separate interviews, maybe

17   three, within investigators from the Securities and

18   Exchange Commission.  That was for an investigation that

19   I'm not sure I can talk about, and I didn't get ahold of

20   those agents yesterday.  I would be happy to approach the

21   bench about that and explain that further.

22         There is, as of this morning -- let me put it this

23   way.  I think it was 6.4 million yesterday.  And as of

24   today, it appears to be 6.5 million in the pot currently.

25   That pot could grow, too, because there are a couple other

```
 1    properties, which we can get into if we have to, and we're
 2    going to get into them at some point, and that could take
 3    it up to 7-and-a-half to $8 million.
 4          There is also a -- I will call it a suit, and that
 5    is a procedure that I am not aware of, because I am a
 6    criminal defense lawyer, and that is called claw back.
 7    And that is for people who made a lot of money, and claw
 8    back -- because the receivership is an equitable
 9    proceeding and everybody should be made whole, those folks
10    who haven't been made whole -- those people who made more
11    money than the other people who haven't been made whole
12    may have to give money back.
13          Then there is another step, and that is a civil
14    suit that has been brought by the Receiver, as I
15    understand it, to sue the bank, Integrity Bank and Trust,
16    for their role in this, which, if it is resolved in the
17    plaintiff's favor, could result in as much as a $10
18    million verdict, which would take us somewhere over $4
19    million above and beyond the restitution that is set out
20    in the probation office's report.
21          That is -- it is still unresolved.  And I
22    understand that the Court has concerns about moving this
23    case along.  We have been kind of stalled on the financial
24    end, in terms of restitution, since about November 29th of
25    2017.  That doesn't mean that Ms. McClaflin hasn't been
```

1    working with the Receiver every single day that she isn't

2    getting medical care or in the hospital, because she has,

3    in my understanding.  And if we have to, we will get into

4    that.

5            But, aside from that, the Court knows that I filed

6    a motion to continue.  I filed two.  The first one was

7    unopposed, because around -- somewhere right around the

8    beginning of March of this year, I had information from

9    Ms. McClaflin's doctor, from the hip ---the hip

10   replacement doctor, I will call him.  He is basically the

11   hip doctor, and the physician's assistant, regarding the

12   nature of the infection that Ms. McClaflin was

13   experiencing and what would be, we anticipated, a surgical

14   procedure that we would know about some time after May

15   10th, today, -- sometime after May 10th, to determine

16   which procedure that would be.

17           As the Court is aware, I got information a few days

18   ago, I think it was around the middle of last week, very

19   frankly, right before I filed the motion.  The

20   information -- the first information was it appears that

21   the infection is as low as it can be right now.  But there

22   is an additional thing that the doctors are saying; they

23   don't think they want to do a procedure, but they're still

24   looking into the nature of the infection.

25           I think this is critically important, as critically

1    important as the potential to realize monetary gain and

2    get people paid in the amount in which they invested.  The

3    reason I think the medical situation is that important is

4    because I have not yet been able to determine if there is

5    a facility in the Bureau of Prisons that is fully capable

6    of dealing with Ms. McClaflin's medical issues.

7         She has been fortunate in the last several years to

8    have good insurance that has covered, I believe it is 300-

9    to $500,000 in medical expenses, and it hasn't stopped.

10   In addition, there are medications she has been taking,

11   some of which I don't know how they resolve that in the

12   Bureau of Prisons.

13        I have some very teeny tiny amount of information

14   that that might be accomplished or accommodated if the

15   sentence was to a federal medical center, and that is what

16   happened.  But I would like -- that is one of the reasons

17   I wanted to have some additional time to find that out.  I

18   am still asking for that.

19        THE COURT:  Denied.

20        MR. HAMMOND:  I expected that.

21        This is a case in which I have never seen like

22   facts in the entire time I have been practicing in the

23   United States District Court.  I would suggest that no one

24   has seen the facts in a case like this.  And, by that,

25   what I mean is, and I would like to know --

1          THE COURT:  All right.  I want to go through with

2     my sentencing.  Are you making your argument for

3     sentencing?

4          MR. HAMMOND:  That is what I am trying to find out.

5          THE COURT:  I would like to go through my normal

6     colloquy, and then we can get to your argument on her

7     behalf.

8          MR. HAMMOND:  And there are a couple witnesses I

9     would like to call on behalf of Ms. McClaflin.

10          THE COURT:  Let's move through, and then when we

11     get to that point, you can call those witnesses.  Who are

12     they, and what are they going to address?  I normally

13     don't have witnesses at a sentencing hearing unless there

14     is a dispute as to the presentence report.

15          MR. HAMMOND:  I spoke to a bunch of people over the

16     last evening.  The people who I would really like to call

17     the most, Your Honor, are Mr. James Barash, who is the

18     Receiver.  There is also a woman named Donna Klimas.  She

19     is -- she is someone who the Court has heard from, in

20     terms of the fact that there is a letter in the materials,

21     in the presentence report.

22          I also received, either yesterday or the day

23     before, an email from her, and spent a fair amount of time

24     talking to her last night.  And I think that she presents

25     a complete perspective, if the Court allows her to speak.

```
 1            THE COURT:  As her friend?

 2            MR. HAMMOND:  I believe she is a friend.  She is

 3    somebody that --

 4            THE COURT:  I see there is a Klimas on here; Doug

 5    Klimas, who is a victim.

 6            MR. HAMMOND:  As well as Donna Klimas.

 7            MS. RHYNE:  Your Honor, if I may, as a victim, she

 8    has a statutory right to speak here today at the

 9    sentencing, not necessarily to testify.

10            THE COURT:  I agree.  I am going to hear from the

11    victims.  So if they want to come forward, they can make

12    their statement.  But, what is the relevance of

13    Mr. Barash's testimony?

14            MR. HAMMOND:  I think it is critical that the Court

15    understand the nature of what I had discussed earlier, and

16    that would be in the form of testimony.

17            THE COURT:  You should have let this Court know you

18    wanted this scheduled for more than an hour because you

19    wanted testimony.  You are set for an hour.  I have read

20    what has been submitted by the Government, in terms of its

21    motion for a variant sentence.  I have read what the

22    probation officer put in its report.  I am aware of the

23    fact that the Receiver has been able to recover a

24    significant amount of funds, much more so than I have ever

25    seen in one of these cases, and that that is in part due
```

1    to the assistance of Ms. McClaflin.

2         I don't know if we need to put on -- take any more

3    time, unless you have something more he is going to offer.

4         MR. HAMMOND:  I tried to give you an outline of

5    what you have not heard.

6         THE COURT:  What have I not heard?

7         MR. HAMMOND:  About the state of the case on the

8    receivership.

9         THE COURT:  What impact does that have on my

10   sentence?  Yes, the victims will be made somewhat whole,

11   not entirely.  I understand, based on the report, there is

12   about another million 4 or something still out there in

13   assets that he is trying to liquidate, which would bring

14   the total up to, maybe, 7.  But he has to take into

15   account his fees, which are currently in excess, as I

16   understand, 500,000; half a million.  So I understand all

17   of that.

18        What else is he going to give me?

19        MR. HAMMOND:  I think you would need to hear from

20   him about the plan of distribution, what has and hasn't

21   happened in El Paso County District Court with respect to

22   the receivership and where that stands, and get more exact

23   details regarding what else can be done.  I think that is

24   very important for the Court to hear.

25        It is also important for the Court to hear from

1    Mr. Barash.  And I expect him to say that Ms. McClaflin's

2    help has not only been critical, it still is.  It is

3    ongoing.  And I think the Court needs to understand and

4    put that in perspective as a factor in sentencing.

5         THE COURT:  Ms. Rhyne?

6         MS. RHYNE:  Your Honor, we don't believe the

7    outcome of the Receiver's litigation should cut for or

8    against Ms. McClaflin.  Mr. Hammond presents a very

9    optimistic view.  I hope he is right.  There is also a

10   chance they will not prevail in the litigation, and the

11   victims will recover nothing.  She will not be punished

12   for a negative outcome, nor should she be rewarded for a

13   positive outcome.

14        At this point, the litigation is in the Receiver's

15   hands, and she does not get credit for that.  She has been

16   awarded, through the Government's motion -- excuse me, I

17   should take that back.  A recommendation that she be

18   rewarded through the Government's motion of a 25 percent

19   downward variance from her bottom-of-the-guideline range

20   for her effort.  She does not need additional testimony to

21   support the facts that are attributed to her at this

22   point.

23        THE COURT:  All right.  I agree with the

24   Government.  I don't think I need any testimony from the

25   Receiver.  I have received considerable information on

 1    that, and it will not impact the statement -- the sentence

 2    I impose.

 3            Do you have other witnesses you wish to present?

 4            MR. HAMMOND:  I did mention Ms. Klimas.

 5            THE COURT:  She is a victim.  She can make

 6    statement.  She will not be a witness.

 7            MR. HAMMOND:  Another potential person I spoke to,

 8    I don't know exactly what his position is about, whether

 9    or not he wants to say something.

10            THE COURT:  What is his name?

11            MR. HAMMOND:  Can I have a -- I would rather not

12    say right now.  I understand --

13            THE COURT:  Well, we are either going to have

14    testimony, Mr. Hammond, or we are not.  And I have to move

15    this hearing along.  So, if you want to come to the bench

16    and give me his name, we can go through that.  If he is a

17    victim, he can make his statement as a victim.  But,

18    otherwise, I am not taking testimony.

19            MR. HAMMOND:  He is a victim.

20            THE COURT:  He can make his victim statement if he

21    wishes to when I ask for them to make their statements.

22            MR. HAMMOND:  I would ask for a brief break to be

23    able to ask him about that.

24            THE COURT:  Overruled.  We are going to move

25    forward.

1         MR. HAMMOND:  I am not asking for the moon here,

2    Your Honor, I am asking for 5 minutes.

3         THE COURT:  If he wants to make a statement,

4    Mr. Hammond, he can make a statement when I ask them to do

5    that.  I will not take a break.

6         All right.  Getting back to the sentencing hearing,

7    have you had enough time, Mr. Hammond, to review the

8    presentence report with Ms. McClaflin?

9         MR. HAMMOND:  Yes.

10        THE COURT:  Did you explain the contents of that

11   report to her?

12        MR. HAMMOND:  Yes.

13        THE COURT:  Do you have any concerns about her

14   ability to understand the contents of that report?

15        MR. HAMMOND:  No.

16        THE COURT:  Ms. McClaflin, did you get a copy of

17   the presentence report?

18        THE DEFENDANT:  I did.

19        THE COURT:  Did you read it?

20        THE DEFENDANT:  Yes, ma'am.

21        THE COURT:  Did Mr. Hammond explain its contents to

22   you?

23        THE DEFENDANT:  Yes.

24        THE COURT:  Do you understand the contents of the

25   report?

1          THE DEFENDANT:  I do.

2          THE COURT:  All right.  Mr. Hammond, Ms. Rhyne,

3    both of you filed objections to the presentence report.

4    So the Government and the defendant object to paragraphs

5    32 and 43 of the report, which asserts that the instant

6    offense resulted in substantial financial hardship to 25

7    or more victims, and thus applied the corresponding

8    6-level enhancement pursuant to United States Sentencing

9    Guideline Section 2B1.1(b)(2)(C).

10         The Government notes that at the time the plea

11   agreement was entered into with Ms. McClaflin, the

12   Government did not have the evidence to support this

13   enhancement, and the plea agreement only included a

14   2-level enhancement.

15         The Government also indicates that the enhancement

16   requires a victim-by-victim analysis, and the Government

17   bears the burden of proving to the Court by a

18   preponderance of the evidence that this enhancement should

19   apply.  And the Government requests that the Court accept

20   the calculation in the plea agreement.

21         As such, Ms. Rhyne, am I to take your pleading as

22   indicating that you are not going to meet the burden that

23   the Government has to prove that the enhancement applies?

24         MS. RHYNE:  Correct, Your Honor.

25         THE COURT:  All right.  The Government is correct

1    that the -- there is a burden on the Government to prove

2    that the enhancement applies.  The failure of the

3    Government to protect the interest of the public by

4    shirking its responsibilities to meet this burden,

5    especially in a case as egregious of this, cannot tie this

6    Court's hands in calculating the appropriate guideline

7    sentence.

8            In circumstances like this, where a massive fraud

9    has been perpetrated, to the tune of 14 million, which

10   is -- 14 million plus, which is admitted by the defendant,

11   loss to the victims in that amount, proof of application

12   of enhancement can be established by the victim impact

13   statements.

14           Both the Court and the probation office have

15   conducted the victim-by-victim analysis that the

16   Government fails to do.  This Court has reviewed all of

17   the victim statements and declarations of loss that are

18   attached to the presentence report.

19           Ms. McClaflin, as I indicated, admits that the

20   total loss to the victims in this case exceeds $14

21   million.  Applying the test set forth in Note 4(F) to the

22   United States Sentencing Guideline 2B1.1, the Court's

23   review confirms that there were more than 90 investors who

24   were defrauded.

25           And in reaching this number, this Court did not

1    count separately the husband and wives who invested

2    together; in other words, the Court counted them as one.

3    Approximately 63 of these victims filed victim impact

4    statements.  And, again, this Court is not counting the

5    individually the victims who were husband and wife

6    couples.

7        All 63 indicated that they suffered significant

8    financial loss from their retirements or other savings or

9    investment funds.  In addition, 28 victims indicated that

10   they had to make substantial changes to their employment,

11   including postponing retirement or going back to work

12   after having retired, or made substantial changes to their

13   living arrangements, such as having to sell their homes

14   and relocate to a smaller, less expensive home; selling

15   their home and moving in with someone else; or selling the

16   family farm or home to just make ends meet.

17       Again, in reaching this number of 28 victims

18   reporting substantial changes to employment and living

19   arrangements, this Court did not count as separate those

20   victims who were husband and wife, otherwise the number of

21   victims reporting substantial hardship based on these

22   factors would have been much higher.

23       A number of victims indicate that they now have to

24   support their elderly parents because they invested both

25   their retirement savings, as well as their parents'

1    savings, in Ms. McClaflin's fraudulent scheme.

2          The defendant's fraud resulted in substantial

3    hardship to both parents, whose funds were invested, and

4    their children, who thought they were making sound

5    investments for the parents and themselves.

6          Thus, the Court finds that the 6-level enhancement

7    of 2B1.1(b)(2)(C) for an offense that resulted in

8    substantial financial hardship to 25 or more victims was

9    properly assessed.  The defendant's objection is

10   overruled.

11         Mr. Hammond, you may make any statement for the

12   record that you wish to make.

13         MR. HAMMOND:  It is the Government's objection,

14   Your Honor, not the defendant's.

15         THE COURT:  I am sorry?

16         MR. HAMMOND:  It is the Government's objection.

17         THE COURT:  You objected, as well.

18         MR. HAMMOND:  I did.

19         THE COURT:  Do you wish to make any statement for

20   purposes of your record on appeal?

21         MR. HAMMOND:  I do not.

22         THE COURT:  All right.  Does the Government wish to

23   make any statements for purposes of the record on appeal?

24         MS. RHYNE:  No, Your Honor.  Thank you.

25         THE COURT:  All right.  The defendant's objection

1    to paragraph 57 was resolved by removal of that conviction

2    from the presentence report.

3        Mr. Hammond, are there any additional objections

4    that the defendant would like to make at this time?

5        MR. HAMMOND:  No.

6        THE COURT:  Ms. Rhyne, does the Government wish to

7    make any objections at this time?

8        MS. RHYNE:  No, Your Honor.

9        THE COURT:  All right.  The Government has filed a

10   motion pursuant to United States Sentencing Guideline

11   Section 3E1.1(b) requesting that this Court grant the

12   defendant a full 3-level decrease in offense level for

13   acceptance of responsibility.  That motion, Document No.

14   19, is granted.

15       At this time, Mr. Hammond, you and Ms. McClaflin

16   can have a seat.  I am going to hear from any victims who

17   wish to come forward.

18       MS. RHYNE:  Mr. Tinkle.

19       THE COURT:  If you could just state your full name,

20   and then spell it for the record.

21       VICTIM TINKLE:  Yes, ma'am.  Good morning.  My full

22   name is David Wayne Tinkle, Jr., T-I-N-K-L-E.

23       THE COURT:  All right.

24       VICTIM TINKLE:  And I think I am almost reading off

25   of your script there, because I represent my father.  I am

1    the power of attorney over him.  He is brain injured and

2    disabled.  He didn't make it here today; it wouldn't be

3    practical.  My wife, also, Robin and I, we all three

4    invested into the scheme.  And my father became brain

5    injured when I was an infant, so I have only know him like

6    that.

7         And that is something that I conveyed to Karen when

8    meeting with her about investing, in going forward with

9    this deal.  She commiserated with me, because she admitted

10   that she is also taking care of elderly father, as well.

11   So we had a common bond there.

12        And so all of my life growing up -- and, again, I

13   am 50 years old.  My father had his accident in June of

14   '68.  He has lived below the poverty line.  I was raised

15   in poverty.  He has not filed taxes any year since then.

16        And so it happened to be that he and his siblings

17   had investments in some property that sold, and in late

18   2016, his windfall was put into this.  He received one

19   interest payment before this all blew up.  I received

20   three.  My wife, zero.  She got in probably within a few

21   hours of this coming to a head.

22        So we were the latest ones to the game.  And,

23   again, I believe I had full faith.  I was being the good

24   son.  I brought him this investment opportunity that

25   turned out to go sour.

1          Yeah, and so meeting with Karen across the table,

2    she had no problem, once knowing his financial and

3    physical condition, taking the $100,000 in exchange for

4    what I believed to be was known as an invalid or useless

5    deed of trust and promissory note.

6          Because of the fraud portrayed upon my father, not

7    only would he fail to receive the agreed upon monthly

8    payments, and to raise his standard of living at the

9    poverty line, but his last bit of treasure was now

10   completely erased.

11          The stress he incurred lead to various

12   stress-related illnesses, landing him in the ER and then a

13   rehab facility for 20 days.  Medicaid only paid for 20

14   days, so he was discharged back home, where once again he

15   relapsed and had to go into ER, and now I am scrambling to

16   find him a Medicaid or VA facility for him to be re-homed

17   in.  He is in his 70s, and moving.  Here, is impractical,

18   because of the altitude and stairs in our home, and all of

19   that.

20          And his options for relocation are limited due to a

21   lien on his home.  He has a reverse mortgage.  And, of

22   course, he has been borrow as much to survive.  He

23   receives about $330 a month on Social Security, and that

24   is his only income.  And, of course, I chip in a bunch.

25          I am not looking for anything out of that, but it

1   has been about $20,000 from my family that has been help

2   to pay for him to live.  So that is my father.

3           For my wife, Robin, she and I both separately

4   invested $50,000.  For us, it has been a re-defined

5   future, and our injured relationship.  Not only is there a

6   very understandable and palpable air of disappointment my

7   father has in me from my lack of wisdom, my wife also has

8   this, and, of course, it causes stress on our marriage.

9           And, of course, we've talked about her returning to

10  the workforce, but she also has a mother with dementia.

11  And we are both only children, so we have to take care of

12  our folks.  So Robin returning to the workforce is not

13  practical at this time.

14          We also have a daughter who has learning to drive,

15  and she wants to go to college.  How we are going to pay

16  for that, of course, it is an ongoing conversation due to

17  our reduced funds and resources.

18          And our daughter has been on a life-long asthma

19  plan, and house we moved into has pets, so we have to get

20  rid of all of the carpet, that has been delayed.  And so

21  she keeps a rescue inhaler on hand.  And so we are having

22  to deal with that.

23          Oh, I don't know why I mention this, but any

24  vacation plans, they are deferred, completely dashed for

25  the time being.

1          My wife, Robin, requires medication to fall and

2     remain asleep due to the anxiety and stress, and that has

3     been ongoing.

4          And, of course, I have a security clearance for my

5     job.  Of course, I come up for review every few years to

6     make sure I can keep that job.  And any time that there is

7     a financial hiccup, they look at that as potential for,

8     well, maybe we don't give this clearance to this guy, and

9     that limits my employment opportunities.  I hope it

10    doesn't happen but, certainly, if it does, I can see how.

11         And so our past, present, and future have all been

12    permanently altered due to this event.  And for all of

13    this, we don't seek revenge, but we do insist on judgment,

14    and a full measure of it.  Thank you.

15         THE COURT:  All right.  Thank you, Mr. Tinkle.

16         MS. RHYNE:  Mr. Sims.

17         THE COURT:  Spell your name.  First spell it for

18    the record.

19         VICTIM SIMS:  I'm Cecil Dean Sims S-I-M-S.

20         Your Honor, we request that you deliver the maximum

21    penalty.  If Ms. McClaflin was sentenced to 1 year for

22    every year that she stole from the lives of her victims,

23    we believe it would be -- would exceed the maximum

24    penalty.

25         Personally, she caused us financial loss, marital

1    stress, unnecessary worry, loss of sleep, loss of

2    appetite, hundreds and hundreds of wasted hours.

3        Jointly, her schemes have cost the victims' health,

4    security, and the ability to care for ailing parents, like

5    we just heard.

6        We lost savings, which forced us to change our

7    retirement plans.  If not reimbursed, we will be required

8    to work years to rebuild our hard-earned savings.  Our

9    futures have been altered by Ms. McClaflin's crime.

10        Karen lived a lavish lifestyle at the expense of

11    her victims.  She flaunted diamond-studded jewelry,

12    expense cars, houses, land, and exotic vacations in front

13    of us and others.

14        I would categorize her as a master con artist that

15    operates without remorse or regret.  Karen preys on

16    trusting members of society that are vulnerable or in need

17    of assistance.  The ruthlessness of her chosen con is that

18    she feigns support, offers a helping hand in need, or puts

19    on a good samaritan act, while she openly deceives and

20    steals from the people she is pretending to help.

21        Specifically, she lied to us about the value of the

22    properties; HomeSource's ownership of the property; the

23    number of lenders allowed to invest in the properties.

24    She told us that our investment funds would be used to

25    improve properties; instead to pay other investors.

1          She lied about HomeSource's profitability and

2    filing our deeds of trust with the county.  We invested in

3    properties, two specifically.  The ones that are involved

4    in this case were never upgraded or never refurbished and

5    sold at a discount.

6          To further characterize Karen's heartlessness, I

7    wanted to share one personal account.  On November 16th, I

8    was hospitalized for 37 days, requiring two emergency

9    surgeries.  And I almost died.  Hospital bills amounted,

10   exceeding a quarter of a million dollars.

11         Karen McClaflin was made aware of my condition in

12   early December, while I was still in the hospital, and

13   both loans mentioned came due.  With full knowledge of my

14   condition and her fraudulent activities and the collapsing

15   state of the HomeSource Partners, Karen encouraged us to

16   extend the fraudulent loans, promulgating her lies, and

17   acting, in my opinion, without conscience.

18         And this is a what if, Your Honor.  If I had died,

19   my wife would have been forced to sell our home and become

20   the financial provider while being cheated by

21   Ms. McClaflin.

22         Your Honor, please do not be deceived by Karen

23   McClaflin's support and cooperation in this case.  We

24   request that the Court disregard Karen's self-serving

25   cooperation and research of the case.  Karen is providing

1    help, however, she does this with self-serving, dishonest,

2    and fraudulent motives.

3          She acts without conscience, shame, or forethought

4    to the impact of others.  We request that the Court

5    deliver the maximum sentence to Karen McClaflin, including

6    mandatory restorative therapy; a punishment that is

7    commensurate with her crimes; and we request that the

8    Court order a full restitution be made to us and other

9    injured parties.

10          And to Karen, not be confused that consequences and

11    forgiveness are two different things.

12          Thank you, Your Honor, for the opportunity to share

13    this information in person.

14          THE COURT:  Thank you, Mr. Sims.

15          MS. RHYNE:  Rick Jackson.

16          THE COURT:  Good morning.

17          VICTIM JACKSON:  Richard Jackson, J-A-C-K-S-O-N.

18          I am speaking today on behalf of my wife, myself,

19    and my mom.  We had just retired, and we thought, "we made

20    it."  We were free from schedules and from the demands of

21    work, and had begun to live out our retirement dreams, but

22    this crime dramatically changed them.

23          Our trust was broken; still is broken.  We now look

24    at life through a different lens.  We are suspicious.  We

25    are anxious.  We have an insecure future.  And the joy of

1    our life is vanished, and we feel like our future is gone.

2         Our retirement has just plain disappeared.  The

3    stress of this Ponzi scheme has challenged our 44-year

4    marriage.  It has caused us to -- sorry.  It has been the

5    most difficult thing we have faced in our marriage.

6         We have lots of nights where we stress at the

7    bills.  We stress over the future.  We stress over how we

8    are going to be able to help our parents.  Pearl's mom and

9    dad are 89 and 88.  My mom is 96 and in assisted living.

10   And we don't see how we are going to have the resources to

11   help.

12        We worry about the increasing costs of living and

13   about the devaluation of the possessions we have.  Our

14   home used to be filled with joy and laughter and music and

15   dancing and entertaining friends and family, and it is now

16   closed in.  It is a quiet place.  Our conversations used

17   to flow easily, but they have become very quiet.

18        Before we invested with Karen, we did the best

19   research we could.  She came recommended highly from a

20   neighbor.  And he invested with her for over 10 years

21   without problems.

22        We talked about the safety -- we talked with Karen

23   about the safety of our investment opportunity, and she

24   said that in all of the years she had been investing for

25   people, she had never lost anybody's principal.

1      When we expressed concern about, what would happen

2    if you didn't show up one day?  What if you were to die?

3    And she explained that she had a business continuation

4    plan that was funded by a keyman insurance policy, and

5    that she had an advisory board that included an attorney

6    and an accountant.  And she had been cross training her

7    employees so that they could provide a smooth transition

8    for the investors if that were to happen.

9      We also read in the *Colorado Business Journal* of

10   what a great job she was doing for investors.  They just

11   sang her praises.  We researched with the Better Business

12   Bureau and found that she had an A+ rating.  We couldn't

13   find anything negative on the internet.

14     Like Dave and like Dean, we don't come from a

15   wealthy background.  I worked for 48 years, setting aside

16   money.  We both worked full-time and part-time jobs to set

17   it aside.  We were diligent in the way we saved.  We

18   didn't go on vacations.  We snuck Cokes and popcorn into

19   movies.  We tried the best we could.

20     But, we were able to put together $720,000.  And we

21   felt we had a pretty secure retirement.  But that $720,000

22   was taken away, and 250-additional-thousand dollars taken

23   from my mom at 96 years of age.  And she knew those were

24   her last dollars.

25     She stripped us of our dignity.  She destroyed our

1    ability to provide in old age.  No more plans of travel or

2    opportunities or hobbies or our ability to be generous

3    with our parents or our children or with this community.

4    We have had to reduce what we give the church.  And all of

5    this because of fraudulent activity.

6         Our monthly income was suddenly reduced to a single

7    Social Security income, a small public school pension, and

8    limited savings.  We got to the point where we now are

9    doing thing like postponing haircuts and trying to take on

10    -- we have a small home business we were about to shut

11    down.  We now have tried to revitalize that.  I have gone

12    back to work in order to pay for our house and for our

13    cars.  We are literally pinching everything we can.

14         My move still has $4,100 -- excuse me, we moved her

15    from a $4,100 a month facility to one that was more around

16    3,600, trying to save in that manner.

17         We just don't understand how knowing the impact

18    this could have on people, how someone could continue to

19    go on and promote this kind of activity.

20         So, like the others, we seek a fair and just

21    punishment.  And if she is able to restore, we would be

22    willing to consider a lesser punishment, but the

23    punishment she has given us is a long-term punishment.

24         THE COURT:  Thank you, Mr. Jackson.

25         MS. RHYNE:  Paula Greco.

1        VICTIM GRECO:   Paula Greco.

2        I will describe how Karen McClaflin gained my

3    confidence in her mission to steal my money by pretending

4    to be my friend.  She first started working with my

5    ex-husband, and I met her through him.  She gave him 10

6    percent on his investment to help support his Christian

7    school.

8        He and I divorced and sold our home.  Karen knew I

9    had just divorced and sold the home and had some money.

10   That money took me 34 years to earn as a special education

11   teacher.  I worked for 21 years in a New York City inner

12   city school, where I taught minority young men to read,

13   and then continued to teach here in Colorado Springs for 8

14   more years at the time of my divorce.

15       I contacted Karen to help me find a house.  She

16   took me out a few times to look at homes, even though she

17   said she usually didn't do that.  She invited me to come

18   into office to obtain an LLC to protect my assets; how

19   ironic, and for $50 acquired in LLC for me.

20       It was then that she sat with me through tears and

21   anguish other my divorce, as we had many heartfelt talks

22   in her office.  Karen would stop whatever she was doing to

23   be kind, supportive, and caring.  She encouraged me that

24   life will be so much better.

25       She then offered to be the realtor for the purchase

1    of my new home, and would not accept payment for that job.

2    She offered me the same investment she offered my

3    ex-husband, so that she could help me out.  Karen promised

4    that my investment would be safe if anything ever happened

5    to her or to HomeSource Realty, because I would own a

6    piece of property, and that I had a deed of trust.

7         After I bought my home and purchased furniture, I

8    then reserved 60K, $60,000 to invest with Karen on April

9    10, 2014.  A few weeks later, Karen called asked if I

10   would invest $15,000 more; she was waiting on a bank to

11   make a large transfer, and she was in a bind.  This time I

12   would get 12 percent, as I would get 10, and then two

13   points at the time of sale of property.

14        On my promissory note, she affixed a note, a

15   Post-It that said, "Thank you so much for doing this, but

16   more importantly, for your hand in friendship and love.

17   Hugs, Karen."

18        Karen promised me that I would receive monthly

19   interest payments until the homes were sold, whereby I

20   would get my principal investment returned to me.  I now

21   know that the first property I invested $60,000 in on

22   April 2014 was sold on May 16, 2015, and not only was I

23   never notified and interest payments kept coming, but on

24   the ONE report, my name was never filed.

25        The second report, the second property where I

1    invested 15,000 on May 21, 2014, the ONE report had a list

2    of five investor who invested from 146,000 to 200,000, and

3    I was not on that list.  That house was sold less than 2

4    months after my investment and, again, I was not notified,

5    and interest payments kept coming.

6         Karen knew how vulnerable I was, and believe that

7    therein lies the tragedy; to be so devoid of humanity to

8    prey upon me at my lowest point, to seize the opportunity

9    of my vulnerability of pain for her gain, speaks volumes

10   to the depravity of Karen McClaflin.

11        I have heard attorneys -- sorry.  I have heard

12   attorneys say in court, in reference to this case, and in

13   reference to those in first position, that their clients

14   should be reimbursed because they have done nothing wrong.

15   Well, I have no position thanks to the slippery dealings

16   of Karen McClaflin.  But I believe I have done nothing

17   wrong, and I have the right to restitution as well as

18   anyone else.  Thank you.

19        THE COURT:  Thank you.

20        MS. RHYNE:  Mr. Koch.

21        And, Your Honor, for the court reporter, Greco is

22   spelled, G-R-E-C-O.

23        VICTIM KOCH:  My name is Jeffrey Koch, K-O-C-H.  I

24   first learned of Karen through my brother, who had

25   invested with her about a year earlier, and he said, oh,

1    she is a great Christian woman.  No problems.  And I was a

2    little bit hesitant, but like some of the other victims, I

3    did my homework, and everything seemed to be on the up and

4    up.  And I am a very trusting person, or I was.

5          Sorry.  I did have a few doubts, so I brought my

6    most cynical friend that I know.  He, too, was a realtor,

7    and we went to her office, and she was point on about

8    everything.  We did -- after we got home, we did some

9    number crunching for about a week, and he said, man, she

10   has got a gold mine.

11         If she buys and sells -- and even though we get

12   between 6 and 8 to 10 percent on investment, she is going

13   to make well over 1.5 to 2 million a year if she would

14   have done it.

15         Well, with the number crunches, I went there to

16   talk to Karen, and I am that "all in" type of guy.  Well,

17   we invested, and she told me that I would be the first

18   person on the deed of trust, and that they would go to --

19   after I put it in there, they would go down to the

20   courthouse and file it, which they never did, so a month

21   later I did it.

22         She just said it was an error on her secretary's

23   part, which, again, I am a trusting person.  Thank God I

24   didn't invest any more.

25         I was number, I believe, number four and number six

1    on the properties once I did do the deed of trust.  And on

2    one of them, one of my brothers, who could not be here

3    today, she didn't even own -- or HomeSource did not even

4    own the property that she had him invest in.  I said, wow.

5         I agree with the victims that have come before me,

6    especially Mr. Sims.  My wife has to continue to work

7    because of this.  And thank God I am able to watch my

8    granddaughter -- my daughter and son-in-law have full-time

9    jobs -- which is the best job I have ever had.

10        I have become friends with another victim, who I

11   spoke with today.  She is a very nice lady.  But I have

12   waited, and I hope you get at least half to full maximum

13   sentence for what you have done.  Thank you, Your Honor.

14        THE COURT:  Thank you, Mr. Koch.

15        MS. RHYNE:  Donna Klimas.

16        VICTIM KLIMAS:  Donna Klimas.  Last name is

17   K-L-I-M-A-S.

18        Karen and I became personal friends after we

19   invested.  We originally started with Trademark

20   Properties, and then it transitioned over to Home

21   Partners.

22        Do I feel betrayed by what happened?  Absolutely,

23   yes.  How someone could lie to a friend.  Yet I know deep

24   down in my heart that Karen never intended to lose

25   people's money.  She started her business with high hopes

1    of success, like all business owners do.

2        I think we all need to acknowledge to ourselves

3    that we were being greedy by believing that Karen could

4    provide us with such a high rate of return on our money.

5    Do we need to take some responsibility for what happened

6    to us?  Yes, we do.

7        Does she need to take responsibility for her

8    actions?  Yes, she does.  Is what happened devastating to

9    all of us?  Yes.  We are in for well over a half a

10   million.

11       We did, however, choose to participate, and did not

12   do the due diligence we should have done.  Since the

13   failure of the business, she has done everything she

14   possibly can to help right the wrong.

15       I have forgiven her, just as God would ask all of

16   us to do.  Life is about people; caring for them and

17   loving them.  It is not all about money.

18       God said, "let he that is without sin be the first

19   to a cast stone."  Thank you.

20       MS. RHYNE:  Your Honor, at this time, there is just

21   the unknown person who will or will not speak.

22       THE COURT:  Is there anybody else who wishes to

23   come forward?  Please do.

24       And are you a victim?

25       VICTIM HENSON:  Yes, I was an investor of $110,000.

1          THE COURT:  State your name, and spell it for the

2    record.

3          VICTIM HENSON:  Cynthia Lynn Henson, H-E-N-S-O-N.

4          It is a terrible and terrifying experience to have

5    lost my investment.  But, to have Karen be incarcerated,

6    it is not going to get my money back or their money back.

7    Having Karen go to prison is not going to right this

8    wrong.

9          I think justice could be better served by keeping

10   her on the job, assisting in the recovery of our money

11   with Mr. Barash, no matter how long it takes.

12         Since there are many things in the works; Integrity

13   Bank lawsuits, selling more of HomeSource assets, I mean,

14   think about it.  It is her files, her system.  She knows

15   where to access these mounds of information to quickly

16   receive -- to quickly get the information for the Receiver

17   and the accountant, which saves our money in the long run,

18   from paying the salaries to the Receiver or the

19   accountants that would recoup our money.

20         The Bureau of Prisons is not set up for this

21   fragile woman.  From 2013 to this date, today, Karen has

22   endured 11 hip replacement surgeries, medications,

23   physical therapy, the Center of Disease Control, and she

24   is running HomeSource Partners in between all of this.

25   This infection is still growing right now.

1        If she goes to prison or is incarcerated, there is

2    our tax dollars again paying for that.  She is better

3    served to be in her office to help recoup our money.

4    Bottom line, this case is like no other.

5        Whatever the legal term is, Your Honor, probation,

6    extended sentence, house arrest, bracelets on her arms and

7    legs, please let her right this.

8        And, for the record, I feel she has had

9    insufficient counsel.  Tom Hammond called me at 5:30 last

10    night to see if I would be speaking on Karen's behalf.  In

11    our conversation, I asked him, did he feel prepared.  He

12    laughed and said, "I'm not prepared.  She's going to

13    prison.  Don't even think about probation."

14        Somehow I brought up money, he said he was getting

15    pennies on the dollar.  So, is he prepared?  Did he put

16    all of the effort into Karen McClaflin's case because he

17    got paid up front?  Is it something that she -- this is

18    this woman's life.  This is this woman's life.  She needs

19    to be out of prison, out of incarceration to help

20    recuperate our money.

21        Thank you, Your Honor.

22        THE COURT:  All right.  Thank you.

23        Is there any other victim who would like to speak?

24        All right.  The total offense level in this case is

25    33.  The defendant's Criminal History Category -- I am

1    sorry, Ms. Rhyne?

2         MS. RHYNE:  I apologize, Your Honor, I will defer

3    to the Court's judgment, but there were two enhancements

4    that were left open to dispute in the plea agreement.  I

5    know one was resolved by a stipulation.  I am concerned

6    that the 2-level enhancement for the $1 million coming

7    through a financial institution, while not objected to, is

8    not factually supported in the plea agreement, and I would

9    like a very brief opportunity to put that on the record.

10        THE COURT:  All right.  Yes, then you may.  Because

11   there was no objection, I didn't see there was anything

12   else.  Move forward.  Go ahead.

13        MS. RHYNE:  Thank you, Your Honor.  The Government

14   calls Melissa Tweet.

15        COURTROOM DEPUTY:  May I have your attention,

16   please.

17        Would you raise your right hand.

18                         **MELISSA TWEET**

19   having been first duly sworn, testified as follows:

20        THE WITNESS:  I do.

21        COURTROOM DEPUTY:  Please be seated.

22        Please state your name, and spell your first and

23   last names for the record.

24        THE WITNESS:  Melissa, M-E-L-I-S-S-A, Tweet,

25   T-W-E-E-T.

1           MS. RHYNE:  Your Honor, before I proceed, I would

2     like her to testify to restitution, which has not been

3     stipulated to at this point.

4           THE COURT:  All right.

5           MS. RHYNE:  Thank you.

6                      **DIRECT EXAMINATION**

7     **BY MS. RHYNE:**

8     Q.    Ms. Tweet, where do you work?

9     A.    IRS Criminal Investigation.

10    Q.    What is your role there?

11    A.    I'm a criminal investigative special agent.

12    Q.    There should be exhibits in front of you.  Do you see

13    them?

14    A.    I do.

15    Q.    What is Exhibit 1?

16    A.    It is the chart I created for the loss per investor.

17    Q.    And what records did you review when you put together

18    this calculation for restitution and loss?

19    A.    Deeds filed with El Paso County.  Investor files

20    provided by Ms. McClaflin.  QuickBooks records.  Bank

21    records.  Settlement statements.

22    Q.    Did you also review victim impact statements?

23    A.    I did.

24    Q.    And the QuickBooks records that you referred to, do

25    those belong to HomeSource and Trademark?

1    A.    They did.

2    Q.    The investor files you referenced, were -- they were

3    from HomeSource and Trademark?

4    A.    They were.

5    Q.    To be clear, are the investments that you calculated

6    for purposes of loss and restitution, investments that

7    relate to investment that were made into HomeSource and

8    not Trademark?

9    A.    Correct.  I did include investments that were made to

10    Trademark that were transferred into HomeSource.

11    Q.    So if there was evidence of those specific

12    investments being rolled into the new company, you did

13    include them?

14    A.    I did.

15    Q.    But if there was an investment specifically into

16    trademark, the prior company, that was not rolled over,

17    did you include that?

18    A.    I did not.

19    Q.    Is that because the scope of the conduct charged here

20    was the fraud committed at HomeSource?

21    A.    Yes.

22    Q.    And did you also learn that in doing your

23    calculations, some victims had received interest and other

24    payments that exceeded the amount of the original

25    principal investment?

1    A.    Yes.

2    Q.    Where that occurred, did you include those victims in

3    your loss chart?

4    A.    I did not.

5    Q.    Where a victim was not yet made whole but received

6    credits against their principal, can you explain the

7    methodology you used?

8    A.    I looked at the properties that were still

9    outstanding and the amounts that were outstanding, and

10    then I subtracted out any interest or points payments.

11    Q.    And so what is left on this chart is the principal

12    investment minus any payment to that victim for interest

13    or fees?

14    A.    Correct.

15    Q.    And were there also evidence of loans that were made

16    personally to Ms. McClaflin that were not part of the

17    scheme that was charged?

18    A.    There were.

19    Q.    Did you include those loans in this chart?

20    A.    I did not.

21    Q.    What was the total amount of loss and restitution you

22    were able to calculate based on your analysis of those

23    records that you discussed?

24    A.    $14,528,206.39.

25    Q.    And approximately how many hours did you spend

1   creating and reviewing this chart for accuracy?

2   A.   Approximately a thousand hours.

3   Q.   Around a thousand, or in excess of a thousand?

4   A.   In excess.

5   Q.   Do you have a specific number that you can tally?

6   A.   I do not.

7   Q.   Moving on to Exhibit 2 what is Exhibit 2?

8   A.   It is a 302 prepared by FBI Special Agent Jonathan

9   Wayne Cronan.

10  Q.   For those of us who aren't law enforcement, is a 302

11  shorthand for a report of interview created by the FBI?

12  A.   It is.

13  Q.   Who is the person interviewed?

14  A.   David Howell.

15  Q.   And who is he?

16  A.   He is one of the owners of Season Investments.

17  Q.   And how did Season Investments -- how is Season

18  Investments involved in this case?

19  A.   They found investors that invested with HomeSource.

20  Q.   Is there a chart in Exhibit 2?

21  A.   There is.

22  Q.   And what is that chart?

23  A.   That chart is the investors that invested in

24  HomeSource through Seasons.

25  Q.   Were those people identified by Mr. Howell during his

1    interview?

2    A.    They were.

3    Q.    And did you compare that list of investors to our

4    loss calculations that you just talked about?

5    A.    I did.

6    Q.    Were each of these investors included in your loss

7    calculation?

8    A.    They were.

9    Q.    And did you have evidence to show that the amount --

10    at least the amount indicated on this Exhibit 2 was, in

11    fact, invested by these investors?

12    A.    I did.

13          MS. RHYNE:  Your Honor, I have no further questions

14    for this -- I am sorry Your Honor, I would offer Exhibits

15    1 and 2.

16          THE COURT:  All right.  Any objection?

17          MR. HAMMOND:  No objection, Your Honor.

18          THE COURT:  Exhibits 1 and 2 are admitted.

19          (Exhibit Nos. 1, 2 are admitted.)

20          MS. RHYNE:  I have no further questions of the

21    witness.

22          THE COURT:  Mr. Hammond, you may cross.

23          MR. HAMMOND:  Thank you.

24                    **CROSS-EXAMINATION**

25    **BY MR. HAMMOND:**

1    Q.    Good afternoon Ms. Tweet?

2    A.    Good afternoon.

3    Q.    Just now you were asked about how you -- the

4    methodology that you used.  And you worked in excess of a

5    thousand hours to come up with the most accurate figures

6    that you came up with; is that fair to say?

7    A.    Yes.

8    Q.    How did you come about working on that?  I know this

9    is awkwardly worded, so let me see if I can do a little

10    better job.  In the thousand hours you worked on it, did

11    you do that by yourself?

12    A.    I did not.

13    Q.    Who else did you work with?

14    A.    I worked with FBI agents special agents in my office.

15    I also worked with the Receiver's accountant.  And I also

16    worked with Ms. McClaflin.

17    Q.    Do you recall any the name of the Receiver's

18    accountant?

19    A.    Denise.

20    Q.    Okay.  To the best of your knowledge, was Denise also

21    doing a separate accounting as you were doing that?

22    A.    She was.

23    Q.    Did you and Denise also cross check each other's

24    figures?

25    A.    We did.

1    Q.    At the ultimate end of the analysis that you

2    conducted and that Denise conducted, was there a

3    difference in the numbers?

4    A.    There is.

5    Q.    Do you know how much that difference is?

6    A.    It is approximately $90,000.

7    Q.    Basically, for all intents and purposes, the numbers

8    are really, really close?

9    A.    They are.

10    Q.    The numbers of hours in that thousand-plus hours, how

11    many hours, if you can guesstimate, did you spend with

12    Denise?

13    A.    Probably at least 500.

14    Q.    How many hours of that thousand hours plus did you

15    spend with Karen McClaflin?

16    A.    I would say probably about maybe like 80.  That might

17    be a little high.

18    Q.    Do you know where Denise got most of her information

19    from?

20    A.    From Ms. McClaflin.

21    Q.    Did you and/or Denise have any problems going through

22    the financial records, going through the books?

23    A.    We did.

24    Q.    Why did that -- what were the problems?

25    A.    One of the major problems was QuickBooks was not up

1  to date.  So Denise had to work with Ms. McClaflin to get

2  the QuickBooks up to date.

3  Q.   Were they able to get it up to date?

4  A.   I do not know if they totally got it up to date or

5  not.

6  Q.   Was -- when you were going through the books with

7  Denise, was it sufficient that you felt comfortable with

8  each other that your numbers were so close?

9  A.   Yes.

10  Q.   Was that in large part due to the fact that

11  Ms. McClaflin had spent so much time with Denise and you

12  to get those numbers straight?

13  A.   Yes.

14        MR. HAMMOND:  I have no further questions, Your

15  Honor.

16        THE COURT:  All right.  Any redirect?

17        MS. RHYNE:  Just briefly, Your Honor.

18                    **REDIRECT EXAMINATION**

19  **BY MS. RHYNE:**

20  Q.   First, Special Agent Tweet, can you explain the

21  discrepancy between your number and Denise's number?

22  A.   Denise's number includes interest and points that

23  were paid through HomeSource's bank account for Trademark

24  and her personal loan.

25  Q.   So they included the interest?

1    A.    They did.

2    Q.    In their calculations, do they include as a loss the

3    underlying investment that was used -- sorry, let me

4    rephrase that.  Did they include the loss associated with

5    the principal investment against which those interest

6    payments were made?

7    A.    They did not.

8    Q.    So their analysis, at least as to those investments,

9    were one sided; all benefit, no loss?

10    A.    Correct.

11    Q.    Is that an appropriate methodology, in your opinion?

12    A.    No.

13    Q.    Two, just to dispel any concerns that the victims may

14    have we let the fox watch the henhouse, did you confirm

15    any information you received from Ms. McClaflin with bank

16    records to confirm you were getting legitimate loss

17    numbers?

18    A.    I did.

19              MS. RHYNE:  No further questions.

20              THE COURT:  All right.  Thank you very much.  You

21    may step down.

22              Ms. Rhyne, do you have any other witnesses?

23              MS. RHYNE:  No, Your Honor.  Thank you.

24              THE COURT:  Mr. Hammond, do you have any witnesses?

25              MR. HAMMOND:  May I just ask generally the room, is

1    there anyone who has something positive to say about

2    Ms. McClaflin?

3            I think that answers that, Your Honor.

4            THE COURT:  Correct.  All right.  If you would

5    retake the podium.

6            MS. RHYNE:  There is one more that would like to

7    speak.

8            THE COURT:  A victim?  All right.

9            MR. HAMMOND:  Mr. Barash, Your Honor.

10           THE COURT:  This is the Receiver?

11           MS. RHYNE:  Yes.  He is not a victim, Your Honor.

12           THE COURT:  He is not a victim.  And I don't know

13   what his testimony would be that I would need for purposes

14   of the issue that was just raised by Ms. Rhyne.

15           MR. HAMMOND:  I gave the Court an idea of what I

16   expected his testimony to be.

17           THE COURT:  All right.  Mr. Barash, come forward.

18           MR. BARASH:  Good morning, Your Honor.  I didn't

19   intend -- when you said is there anybody who would say

20   something positive about Ms. McClaflin, I would, but I

21   don't know whether -- I didn't hear what Your Honor said

22   to --

23           THE COURT:  I will allow you to take the stand and

24   have Mr. Hammond question you.

25           Come forward and be sworn in.

1          COURTROOM DEPUTY:  May I have your attention,

2     please.

3                          **JAMES BARASH**

4     having been first duly sworn, testified as follows:

5          THE WITNESS:  I do.

6          COURTROOM DEPUTY:  Please be seated.

7          Please state your name and spell your first and

8     last names for the record.

9          THE WITNESS:  My name is James Barash, B-A-R-A-S-H.

10         THE COURT:  You may proceed.

11                      **DIRECT EXAMINATION**

12    **BY MR. HAMMOND:**

13    Q.   Good afternoon, Mr. Barash.

14    A.   Good afternoon.

15    Q.   What is your occupation?

16    A.   By training, I am an attorney, but I haven't actively

17    practiced for many years.  And I do business things and

18    sometimes serve as a court-appointed receiver, et cetera.

19    Q.   How long have you been a court-appointed receiver?

20    A.   Probably 10, 12 years.

21    Q.   How many cases have you worked on as a

22    court-appointed receiver?

23    A.   A dozen, 15, something like that.  I don't have those

24    numbers right in front of me.

25    Q.   Okay.  Do you recall how you came to be a

1    court-appointed receiver in this case?

2    A.    I do.

3    Q.    How did you come to be appointed?

4    A.    I was contacted by an attorney who works with

5    Mr. Warner, and asked if -- he knew I served as a

6    Receiver.  He has been involved in other cases I served as

7    a Receiver, and he asked if I might serve as a Receiver in

8    a real estate case.  That a client of his had a little

9    problem.

10          Not knowing anything about it, I said, sure, I

11   could do that.  Then I learned a little bit more, and

12   learned about the allegations of fraud and et cetera.  And

13   I said to him, why do you want -- I have never heard --

14   when he used this term, and I would like to correct it

15   later, but what I said is I have never heard of the crook

16   asking for a Receiver.  What, have you lost your mind?

17          He said, no, no, my client made some mistakes, but

18   she really wants to make it right, and she wants to show

19   she is making it right.  So I said, let me talk to her,

20   because I wanted her to understand my attitude on these

21   things.  And I went in with an attitude that I just

22   assumed that this was horrible.  And it is horrible, that

23   hasn't changed.  But that she was a crook, that there was

24   a pot of gold somewhere, and all these bad things

25   happened.

1          I met with her and Mr. Werner for a couple of

2   hours.  She explained what had occurred.  And I said,

3   listen, I don't know why you want me as a Receiver.  I

4   said, it is crazy.  She said, I want to show that I really

5   want to help.  And I said, well, let me give you a

6   warning.  I said, I will only do it on one condition.  I

7   said, if you are helpful and you do what you say, I will

8   be sure to make that fact known.

9          And she did beyond what I thought, but I will get

10  to that in a minute.  I said, however, if you lie to me

11  once about anything, you're toast, this is the worst

12  mistake of your life, because I will make sure that this

13  is brought to light.

14         And then the odyssey began.  And this case is like

15  no other.  I heard victim impact statements.

16  Interestingly, two of them were the worst ones.  I cried

17  when I read them in my office.  These people, I totally

18  get it.  They are right.

19         On the other hand, my job, and what I feel very

20  strongly about as a Receiver, and I am proud of doing it,

21  and I have had some success in general.  I try and

22  maximize the value of the estate and try and make the

23  victims as whole as I possibly can.

24         And for all of the anger that these people have --

25  and if I were one of them, I would too.  I don't dispute

1    any of it.  But, I can't stress enough, not only how

2    helpful Karen has been in recreating this stuff -- and if

3    the Court wanted, I was at the office yesterday just to

4    see something, and I said, a picture is worth a thousand

5    words.

6         Karen was working with Denise Tinsley, our

7    accountant, finalizing some stuff.  This accounting is

8    incredibly complex.  What you heard Ms. Tweet testify to

9    is all accurate, but we had to do a lot more than what she

10   did because of our other claims between claw backs and a

11   claim we have against the bank that is very complex.

12        And Ms. McClaflin's assistance has been invaluable,

13   not only in finding records and showing and explaining how

14   this connects to that, because the records weren't

15   complete.  The records that were there were accurate, but

16   a lot of the QuickBooks, for instance, the person who put

17   the date in, they classified things wrong.  All the

18   entries were there, the dollars were right, but they

19   called something this when it should have been that.

20        In addition to this, there are rooms full of files.

21   I can show you pictures of what they are going through.

22   There is only one person who knows their way through this

23   morass, and that is Ms. McClaflin.

24        So, from a purely economic, trying to get the best

25   for the investors, our biggest claim is out there, and it

1    is our claim against the bank.  The Court knows, you never

2    know what is going to happen in a case.  I am telling the

3    Court, in my opinion, we have a very good case.  And in a

4    lot of law enforcement authorities' opinions, they believe

5    we are right on the facts.

6         That doesn't mean we will win.  It doesn't mean we

7    will lose.  I can make no promises.  I also would love to

8    be able to tell the Court, and even more than the Court,

9    the victims, I have a check for you tomorrow because I

10   have all this money sitting in the bank.  But I can't

11   until the District Court Judge in El Paso County

12   authorizes it.

13        And there are claims of competing interests of the

14   various deeds of trust holders, some of whom are

15   sophisticated lenders, who made sure their deeds of trust

16   were recorded.  And they are saying, our deeds of trust

17   are sacrosanct, you can't use any of that money.  We get

18   it all, plus our fees, plus interest, plus our et cetera.

19        Then there are other people who, under various

20   cases and laws and the way Ponzi schemes are interpreted,

21   take the position, well now wait a minute, the Ponzi

22   scheme can be challenged, especially if you knew or should

23   have known.  And Court knows this far better than I.

24        The point I am getting to is, I do not have an

25   honest opinion as to when this money is going to be

1    released.  And it is not in my control.  And the judge has

2    been very good.  I think he gets the arguments.  He's been

3    very responsive at setting hearings.

4         But this big fraudulent transfer action and claim

5    we have against the bank is going to take awhile.  And I

6    don't know what "awhile" means.  I would be lying to you

7    if I said anything else.  Now I will be quiet.

8    Q.   I have a couple other questions for you.  I think it

9    is obvious, but I have to ask it in this way.  Have you

10   recovered -- have you been able to recover an amount of

11   money for -- ostensibly for the victims in this case?

12   A.   Well, there is $6.4 million sitting in the HomeSource

13   trust account.  There is roughly another, I expect another

14   million plus for the goods from both marital properties.

15   One of the things, Karen and her husband had some marital

16   properties, some of which Karen put HomeSource deeds of

17   trust on and didn't mention to her husband.  He is a

18   victim too, in this thing.  And they are divorced now.

19        And we have agreed that we get Karen's half of the

20   marital equity, and the husband will get his half.  So

21   when that is all netted out, when I take that and when I

22   take the sale of the HomeSource office building, which we

23   have continued to use, because there are these thousands

24   and thousands of pages of files and documents, et cetera,

25   and when I sell those, I expect to recoup another million

1     dollars.

2              We have got claw back claims.  And, I apologize, I

3     can't remember right off the top of my head what they

4     amount to now.  My counsel is back there, and if you want

5     me to ask him, I can ask him, if you care.  I am guessing

6     between half a million and million-and-a-half dollars.  I

7     just don't remember.  I don't know.

8              So, and if we recover on the bank claim, the claim

9     I honestly believe is worth $10 million on its face.  That

10    doesn't mean we will get $10 million.  And having Karen

11    there, I believe, will be very helpful to me.  That is a

12    purely selfish statement to the investors, to the victims.

13    Q.   In terms of the liquidation of the assets, is there

14    also a 5-acre property?

15    A.   Is there also what?

16    Q.   A 5-acre property that has been hasn't been

17    developed, are you aware?

18    A.   There is a lot, yes.

19    Q.   And do you have any idea of the value of that?

20    A.   It is in a hot area that I know very well, because it

21    is next to Glenn Eagle, that I developed.  It's -- I don't

22    know the current -- I know the market is very hot.  I am

23    not familiar with 5-acre parcels.  I am not familiar with

24    whether that is sub-dividable.  I have not focused on that

25    parcel yet.

```
1    Q.   Is there also an office building that has not been
2    sold -- I think you might have referred to that.
3    A.   That is what I just referred to.
4    Q.   At the end of everything, when this comes -- when you
5    are done doing all your work, when your folks move out of
6    that building -- and that is where Denise is; right?
7    A.   Yes.  She is in the back of the courtroom, but when
8    she is working.
9    Q.   She is working out of that building?
10   A.   Right.
11   Q.   When she moves out and there is no one else in that
12   building, do you intend to sell that building?
13   A.   I intend to sell that building and have an auction of
14   the personal property that is around.  It will raise a few
15   more dollars, but not significant in the grand scale of
16   things.
17   Q.   Fair to say the building is worth more than the
18   personal property?
19   A.   Oh, the building is worth probably a half million
20   dollars, using round number.  And the personal property --
21   I like auctions.  I have been to lots of them.  It could
22   go as low as $5,000 or as high as $50,000 for the personal
23   property, depending on the day and the weather and the
24   people.
25   Q.   If I am hearing you correctly, right now there is
```

1    about $6.4 million that you have been able to obtain?

2    A.    Sitting in the trust account, yes.

3    Q.    Has that been increased, to your knowledge?

4    A.    What do you mean, "been increased?"

5    Q.    Did you hand me a document?

6    A.    No.    The document I handed you was the latest update

7    of the sales.    You called me last night.    You were telling

8    me numbers.    I said I don't know if those are the latest

9    numbers or not.    I stopped in my office this morning and

10   printed this out.    That document I gave you, that 6-point

11   --  the number you have there, that is everything that has

12   sold as of today.

13   Q.    That is what I am talking about, the number we were

14   referring to 6.4 million was about November 28th or 29th

15   of 2017?

16   A.    I don't know.    6.4 million is what is in the bank.

17   That may say 6.5 or something, but there are a few

18   legitimate sales loss that came out.

19   Q.    I understand that.    The old one goes back to the end

20   of November.    This one comes to today, and it is in the

21   amount of $6,515,766.06.

22   A.    And that was net sales proceeds out of which, what is

23   left in the bank, because we will have to take some taxes,

24   et cetera, is the 6.4 million something I told you.    I am

25   rounding it to 6.4 something.    I don't know to the penny

1    what it is.

2    Q.   If you were able to get the additional money from the

3    marital property, from the claw backs, if I understand

4    correctly from our discussions, that would be somewhere

5    around 7-and-a-half to $8 million?

6    A.   I think that is a reasonable guesstimate, yes.

7    Q.   Okay.  Do you know if it could -- could it be more or

8    less?

9    A.   You are right, it could be.

10   Q.   Okay.  If you were successful -- if you are

11   successful in the civil suit against Integrity Bank and

12   Trust, would that add to the pot of money?

13   A.   Yes.

14   Q.   And I believe you said a minute ago that that could

15   be as much takes $10 million?

16   A.   It could be, or as little as zero.  I have to be

17   honest.  I believe we will prevail, but I don't know -- I

18   don't want to represent to anyone in the courtroom or the

19   Court any guarantees of what -- how the music is going to

20   end.

21   Q.   I understand.  I want to just talk to you briefly

22   about Ms. McClaflin's assistance to you and your

23   assistance to Denise.  What is Denise's last name?

24   A.   Tinsley, T-I-N-S-L-E-Y.

25   Q.   Denise Tinsley.  Have you observed, over the course

1    of the last year or more, the work that Ms. Tinsley has

2    done with Ms. McClaflin to get the books straight and get

3    the accounts straight?

4    A.    I have.

5    Q.    Can you guesstimate the number of hours?

6    A.    Well, Denise keeps records specifically of hours that

7    she has worked with -- Karen's work with Denise.  And I

8    smiled when I heard Ms. Tweet testifying to a thousand

9    hours, because Karen alone, of the clocked hours she has

10   physically been present with Denise is 400 hours.  In

11   addition, to which Denise works at home, and et cetera for

12   more hours.  In addition to which Karen has come and met

13   with me on different things that our accountant -- she

14   knows the properties.  She knows the neighborhood, and she

15   was an excellent realtor.

16        So she was helpful in upping the value of the sales

17   and getting me some subs to fix things up, et cetera.  So

18   she spent a lot of time with me.  Any time I ever called

19   her for any assistance, if she doesn't answer the phone

20   immediately, I get a call back very rapidly, if not within

21   minutes, it is the next day.  And it starts with an

22   apology; I am sorry I couldn't call you yesterday, I was

23   in the hospital.

24        She has been -- I know the bad things that she did.

25   I am not minimizing them at all.  They are true.  But,

1    these good things are true, too.

2    Q.    You have heard from Agent Tweet, who testified

3    earlier.  Are you aware of any other FBI or IRS agents who

4    worked with you and/or Ms. McClaflin?

5    A.    Well, I know that -- when I first got into this and I

6    saw a few things that caused me concern, I went to the

7    FBI.  And as I was explaining what had -- I had seen so

8    far, plus what I had been told by Ms. McClaflin to the

9    FBI.

10         They had some questions.  And I said, why don't I

11    get her to come in and talk to you.  And the response was,

12    well, we doubt that she would talk to us.  And I said,

13    well, I will talk to her and her lawyer.  The whole deal

14    she made was she was going to be helpful and do things.

15         So, I called Matt, who is sitting there, and I

16    said, Matt, the FBI wants to talk to Karen.  And if the

17    deal is she is going to show that she is helping, it makes

18    sense to me.  And Matt said okay.  So we went up to the

19    FBI office, and Ms. Tweet was there, and agent Cronan was

20    there.  There were a lot of other people from a lot of

21    other agencies all around this table.  And it was a

22    multi-hour, very interesting interview, that was much more

23    than I understood, at the end of which many law

24    enforcement people, like, afterwards, gave me this like,

25    wow, that was something.

1          I have continued to stay in touch, primarily with

2     Mr. Cronan, mostly because he is just a very nice guy, and

3     we get along.  And he and I both share the common opinion;

4     we have never seen a situation like this.  When there is

5     this kind of theft in a situation, the money is usually in

6     someone's pocket, and they have enriched themselves.

7          This woman took a $40,000 a year salary, and every

8     other penny is accounted for.  I heard stories of

9     luxurious trips and all.  She was married to a husband who

10    was a professional at making money, and I don't think,

11    from what I've heard, that I have heard anything

12    extraordinary.

13         I am not minimizing any of the complaints.  They

14    are right.  But I think Karen did not, from what I can

15    tell, lead a high flying lifestyle, and she has given us

16    everything.

17    Q.   Have you filed a plan of distribution with the El

18    Paso County District Court?

19    A.   We have filed a proposed -- I have to emphasize that

20    word -- plan of distribution with the Court.  And until

21    and unless the Court approves it, that is not it.  There

22    are going to be objections.  There are going to be

23    hearings.  Counsel will get to talk.  But, in a nutshell,

24    Your Honor, what we are proposing -- and if you want to

25    hear it better than me, my counsel is here, and he can

1    explain it better.

2          We take winners and losers.  The winners are the

3    people who got more than they put in.  We don't care

4    called whether it was called points or interest or

5    whatever.  If you put in a hundred dollars, and you got

6    back 150, I want 50 back.  The losers, if they put in a

7    hundred dollars and they got 35 back, I am going to try to

8    get them 65.

9          So, in the plan of distribution, we are saying,

10   there are many deeds of trust that we're challenging.  And

11   we think the Court should put them aside and throw that

12   money into a pot for the other -- for the remaining

13   unsecured creditors.  Treat some of those -- some of the

14   deeds of trust just like the other investors who were

15   unsecured.

16         There are other deeds of trust that are seasoned

17   and older and may have gone of record prior to the Ponzi

18   being established.  That is one of the reasons this

19   accountant took so long; we had to go through thousands of

20   documents to figure out at what point did this stop being

21   a legitimate business and turn into this Ponzi scheme;

22   taking from Peter to pay Paul.

23         And our senior accountant, Marvin Strait, has been

24   directing Denise Tinsley.  And this took all of this time

25   to do, but we will end up acknowledging that this pile of

1    deeds of trust gets the first money.

2         Now, let's say one of those deeds of trust is good,

3    and they have a deed of trust on a house for $75 and the

4    house sells for a hundred, then our position is they get

5    the 75, the 25 goes into the pot for everyone else.

6         And that is, in short, a summary -- we are

7    proposing that is what the Court does and how the Court

8    distributes the money amongst the victims.  It is up to

9    the Court.

10   Q.   Was that Receiver's plan of distribution filed in the

11   El Paso County District Court on April 17th of this year?

12   A.   You got a filing stamp, I believe you.  I have no

13   idea of the date.  I am terrible on dates.

14   Q.   Okay.  Is there anything I have missed in speaking

15   with you?

16   A.   No.  It's been -- I think everybody has the picture,

17   the good and the bad.  And I am glad I don't have your

18   job, but I hope I have Karen to help me.

19        THE COURT:  Nope, you can't leave yet.

20        THE WITNESS:  I am sorry, excuse me.

21        THE COURT:  Cross-examination.  Ms. Rhyne may have

22   cross-examination.

23                      **CROSS-EXAMINATION**

24   **BY MS. RHYNE:**

25   Q.   To be clear, you have this ongoing litigation with

1   Integrity Bank and Trust; correct?

2   A.   Yes, ma'am.

3   Q.   And they have, I am not sure what it is styled as in

4   the Court, but something that at least amounts to a

5   counterclaim, where they are seeking to enforce any of the

6   first deeds of trust their investors have, yes?

7   A.   Their position -- I am glad you raised that.  Let me

8   make it clear so everybody understands it.

9   Q.   Sure.

10  A.   Their position is, listen, guys, we have deeds of

11  trust, they're good.  We are owed the hundred dollars we

12  put in, plus, per the deeds of trust, we want our attorney

13  fees, court costs, interest, et cetera.  That is the

14  dispute.

15  Q.   And if they prevail --

16  A.   If they prevail --

17  Q.   -- not only will you not get 10 million extra, they

18  will dip heavily into the 6.5 you have collected; yes.

19  A.   Absolutely.  It would be a disaster.

20  Q.   So maybe this goes very well for the victims, yes?

21  A.   Yes.

22  Q.   Maybe it goes poorly?

23  A.   Absolutely.

24  Q.   Today we don't know?

25  A.   That is correct.

1    Q.    I wish you all the luck in the world, but I wanted to

2    make that reality clear.

3          I want to make something else clear.  You and I

4    have discussed this case a number of times; correct?

5    A.    I think two.

6    Q.    At the very beginning of our discussions, I made it

7    perfectly clear to you that the criminal case was not

8    going to take second seat to the receivership, and we were

9    not agreeing to allow Ms. McClaflin to stay out of jail

10   for the term that it took you to resolve the estate.  I

11   made that perfectly clear, did I not?

12   A.    You were very clear that that was your position.  And

13   I never suggested that the receivership should run the

14   criminal case.  I want to make that clear, also.

15         MS. RHYNE:  Thank you.

16         THE COURT:  All right.  I have a few questions.

17         So, with respect to the -- when you testified that

18   there are claims of competing interest of various deed

19   holders, are you talking about the deeds of trust held by

20   Integrity Bank or its investors?

21         THE WITNESS:  Among others.  Integrity Bank put in

22   money from individual's self-directed IRAs.  So some of

23   them are in this mix I am talking about.  Some of them,

24   they are in first place.  And then there are other regular

25   investors, individuals who have got these claims, as well.

```
 1           THE COURT:  All right.  So, have all of the

 2    properties related to those deeds of trust been sold?  In

 3    other words, is the 6.4 that is in the bank subject to

 4    those deeds of trust, and there is not any other assets

 5    out there that have those on them?

 6           THE WITNESS:  No.  The money that is in the bank

 7    includes all of the HomeSource properties and deeds of

 8    trust, that would include Integrity.  But, in addition to

 9    that there are marital properties that were titled in the

10    name of Karen and her husband, that I am also selling, and

11    I have not sold those yet.

12           And, off the top of my head, I cannot remember

13    whether or not there are some HomeSource deeds of trust on

14    those or not.  I don't think there are, but I could be

15    mistaken.

16           THE COURT:  All right.  Well, put those aside, and

17    looking only to the 6.4 million that is in the bank, if

18    the deed of trust holders who are contesting that theirs

19    should be set aside, prevail, what does that reduce that

20    pot of money to, ballpark?

21           THE WITNESS:  What does that what?

22           THE COURT:  Reduce the pot of money, 6.4 million

23    to, just ballpark?  What are we talking about of the 6.4

24    million?

25           THE WITNESS:  May I ask my counsel if he remembers
```

1     the number?

2          THE COURT:  You may.  And I will tell you, this is

3     not so much for sentencing as for letting the investors

4     know what they are looking at.

5          MR. LUCAS:  Your Honor, Peter Lucas, Appel, Lucas &

6     Christensen.  I don't know if I need to be sworn.  But, to

7     answer your question most directly, there is no

8     unencumbered property in the receivership estates.  If

9     those deeds of trust were all proved to be valid, with the

10    exception of the office building, which might have a very

11    small slice of equity, there would be nothing in the

12    receivership estate for investors.

13         So, unless we can get rid of some or all of the

14    deeds of trust, there will be nothing.

15         THE COURT:  All right.  And how long do you

16    anticipate that litigation is going to take?

17         MR. LUCAS:  If the litigation were to go to

18    fruition, we're a year or more before we even get to

19    trial.  We are in fairly serious discussions with some of

20    the investors, in terms of settlements.  So we think that

21    things could progress more quickly, and that is only

22    because of settlement.  If we are talking litigation, we

23    will not get to trial in a year.

24         THE COURT:  All right.  And so I assume, then,

25    Mr. Barash, that the investors will see none of their

 1   money in pay back until these issues are all resolved,

 2   which could be more than a year, then?

 3        THE WITNESS:  I believe that is correct.  It is all

 4   dependent on what happens with the Court in El Paso

 5   County.

 6        THE COURT:  All right.  That is all I have.

 7        Mr. Hammond, do you have anything further?

 8        MR. HAMMOND:  No, Your Honor.

 9        THE COURT:  All right.  Thank you very much, sir,

10   you are excused.

11        THE WITNESS:  Thank you very much, Your Honor.

12        MS. WULF:  Your Honor, may I speak for a moment?

13        THE COURT:  Who are you?

14        MS. WULF:  My name is Jessica Wulf, and I am a

15   friend of Karen McClaflin.

16        THE COURT:  Are you a victim?

17        MS. WULF:  I am not.

18        THE COURT:  Then you may not.

19        MS. WULF:  But Mr. Hammond asked if any of us could

20   say anything positive.

21        THE COURT:  You may not speak.  You are not a

22   victim.  You are not a witness here.  We don't do

23   character witnesses.

24        All right.  Mr. Hammond, would you and

25   Ms. McClaflin please retake the podium.

1          Court finds that the total offense level in this

2    case is properly calculated in the presentence report;

3    that is an offense level 33.  The defendant's Criminal

4    History Category is a I.  That results in an advisory

5    range of imprisonment of 135 to 168 months.  The

6    supervised release range is not more than 3 years.  And

7    the fine is in the range of 17,500 to 29 million plus,

8    which is twice the gross gain or loss.

9          The Court also finds, unless you have some evidence

10   to present otherwise, Mr. Hammond, that the restitution

11   amount, based on the evidence presented, would be

12   $14,528,206.39.

13            MR. HAMMOND:  Your Honor, I am assuming that comes

14   from --

15            THE COURT:  The testimony that was just put on.

16            MR. HAMMOND:  -- the final result in Government's

17   Exhibit 1.

18            THE COURT:  Yes.

19            MR. HAMMOND:  I do not -- is the Court going to

20   allow me to speak on Ms. McClaflin's behalf?

21            THE COURT:  Absolutely.  Yes, absolutely.  We are

22   just going through the preliminaries here.

23          My way of dealing with sentencing, because it has

24   been a long time since you have been before me, is I will

25   tell you where I am going, in terms of my inclinations, so

1    that you can target any arguments you have to what my

2    concerns are, and to persuade me otherwise, or to persuade

3    me to go the way I have indicated, if that is what you

4    want.

5         I will hear from you, then Ms. Rhyne, and finally,

6    if Ms. McClaflin wishes to make any statement to me on her

7    own behalf, I will hear from her.

8         All right.  As part of my protocol for determining

9    whether the advisory guideline range is a range that is

10   sufficient, but not greater than necessary, to achieve the

11   objectives of sentencing, I have reviewed the presentence

12   report, I have considered the sentencing guidelines, and

13   the factors set forth at 18 United States Code Section

14   3553.

15        Ms. McClaflin is 59 years old.  She stands before

16   this Court for sentencing on her third felony conviction.

17   Although her first two felony convictions occurred more

18   than 30 years ago, the Court notes that they involved

19   stealing from her employers.  She was convicted of

20   embezzlement.

21        In this offense, she ran a Ponzi scheme for several

22   years, where she made false promises to her investors and

23   manufactured documents intended to make it appear as

24   though those promises were being kept.

25        She was aware that she could not continue to meet

1    the promises she was making to these investors.  And

2    instead of declaring bankruptcy, as her original partner

3    did, and cutting her losses, she chose to continue to seek

4    out investors in order to continue her fraudulent scheme.

5         During the course of that scheme, Integrity Bank

6    and Trust began funneling investors to the defendant.  At

7    some point, apparently, Integrity Bank began pressuring

8    her to protect its investors.  This pressure resulted in

9    the defendant then forging documents to show Integrity

10   Bank that its investors were protected.

11        That is what this testimony was all about of the

12   litigation with the bank, to see -- they are claiming they

13   have the first position on those properties because of the

14   forged documents that were put forward by Ms. McClaflin.

15        Eventually, Ms. McClaflin was not able to make the

16   minimum payments that she was making to cover the interest

17   to show the investors that they were getting something

18   back, and her scheme was uncovered.

19        Ultimately, the defendant ended up defrauding many

20   of her investors of a substantial amount of their savings,

21   and as a result, the investors lost -- or her victims lost

22   more than $14 million.

23        Many of the victim investors, as I have indicated,

24   have submitted declarations of victim losses and victim

25   impact statements.  A review of those statements reveal

1   that the defendant's action has caused significant

2   financial hardship for her many investors.

3        Her investors were impacted in a variety of ways,

4   including loss of most or all of their savings, inability

5   to retire, having to return to work, inability to provide

6   their children with financial assistance or any

7   inheritance, selling or downsizing their homes, and a few

8   have even had to move in with friends or family.

9        Many of the investors also discussed how the

10  defendant's action made them feel betrayed or left them

11  questioning their ability to trust people.

12       It has caused marital difficulties from some

13  investors because of the stress they are experiencing as a

14  result of their losses.

15       I am going to read from those statements that I

16  found to be the most pertinent.  And some of you have

17  spoken.  I have chosen your statement, and to the extent

18  you have already indicated something that I was going to

19  read, I am going to skip over it.  But these are some of

20  the victim impact statements:

21       "I am 71 years old, and my wife is 63.  To have

22  someone wipe out the majority of our retirement income has

23  been emotionally difficult.  There is a wide range of

24  emotions, from anger to fear to sadness and resignation.

25  In fact, she stole my last remaining retirement dollars.

1         Any possibility of slowing down at work and

2    enjoying more time together or with family has been

3    eliminated."

4         Another one talks about his mother:  "Due to a

5    brain tumor and the effect of surgery to remove it, my

6    95-year old mother has lost the use of one eye and has

7    advanced macular degeneration in her remaining eye.  She

8    has no hearing in one ear because the auditory nerve was

9    cut during surgery.  She requires a hearing aid in her

10   other ear.  My mother requires help with medication

11   management and balance issues, person hygiene, dressing,

12   and food preparation.

13        If her money, in fact, is lost, which was 250,000,

14   we will not be able to continue her care without depending

15   on governmental aid and assistance."

16        "Karen has totally changed our lives.  She has

17   taken our dignity, destroyed our retirement, robbed my

18   mom's security, and threatened her well-being.

19        Her greed has caused damages on all her investors

20   and possibly some employees and has displaced her

21   renters."

22        "My wife and I worked hard to set aside money for

23   retirement.  I worked for a small company that did not

24   participate in retirement programs, so I knew I had to

25   save.  We were successful at building what we thought was

1      a comfortable retirement account of 720,000.

2             Eventually we invested all retirement money and

3      most of our personal savings with HomeSource Partners.

4      Ms. McClaflin took it all; 720,000.

5             Our hopes for an independent future, the pride of

6      knowing our children would not have to provide for us as

7      we age, our dreams of travel, and our ability to be

8      generous with family, friends, church, and our community,

9      have been lost.

10            Now that our retirement account has been pillaged

11     by Karen's Ponzi scheme, we are dependent on my Social

12     Security income, my wife's small pension, and what remains

13     of a small emergency fund."

14            "This has strained us not only financially, my

15     husband and I haven't slept through the night since early

16     February, and I often wake up in a panic, with my heart

17     racing.  I have so much anxiety.

18            Do you know how crushing it feels to have your

19     daughter tell you that they will provide 500 a month to

20     help?

21            The money we invested with Karen was lost, and lost

22     because of her actions was my life savings and profit from

23     the sale of our personal home.  We will now be living with

24     our son.  I am 72 years old, have cancer, and suffer from

25     depression because of this loss.  I will now have to find

1    a job in order to buy food, pay bills, et cetera.  She has

2    totally destroyed my life."

3         "We will not be able to purchase a home now and

4    will live with our son.  At this age, we will never be

5    able to recover that investment and will be forced to work

6    the rest of our lives if we are able.  It is very

7    difficult to explain the stress and turmoil this has

8    placed on us."

9         One gentleman described the emotional impact as

10   "unbelief, anger, and foolishness" as to how he could let

11   someone "trick me out of most of our retirement savings.

12   Karen took more than money.  She stole whole generations

13   of family vacations, gifts, college educations, which

14   cannot be replaced."

15        "This money derived from my mom's hard work that

16   she left me in a family trust when she passed away.  I

17   felt that I had done her a great disservice in letting

18   this happen.  And it has sent me, at times, into a state

19   of deep depression.

20        This has made my current living situation very

21   unstable, to the point where I just break down.  It has

22   also caused some pre-existing medical problems to

23   intensify."

24        Since I no longer have this income, I was forced to

25   file for Social Security early, and now I am trying to

1    make it on a little over 1,400 a month.  So this means

2    that the home I have with my shop on it that keeps me

3    entertained for 37 years has to go.  And I am currently

4    trying to find somewhere I can afford to live."

5         "Due to her actions, I have been forced to move in

6    with a friend and try to obtain other employment and sell

7    many other assets.  Karen McClaflin took money that I

8    worked many years to obtain and used it as her own.  She

9    made promises to me and several others that she could not

10   have ever intended to keep.  She has nearly destroyed my

11   life financially."

12        "Emotionally this has been devastating.  Karen had

13   become a trusted friend.  To be lied to and betrayed,

14   resulting in the loss of our life savings has been

15   extremely painful and difficult to cope with.  The

16   majority of our life savings was invested in HomeSource.

17   This loss caused us to lay off two employees, and the

18   viability of our organization, which was a non-profit, is

19   also at risk.

20        Any plans to move in 2017 have been delayed

21   indefinitely, and our kids' college funds and retirements

22   were seeded in this investment.  It has impacted every

23   area of our work and financial future."

24        "The loss of this income crushed our future plans.

25   Travel, possibly becoming snow birds, that plan is now

1    impossible.  We are still going to have to sell our

2    Colorado home to repay the HELOC and move into something

3    smaller, and the rest of the plan has been destroyed.

4        In addition to the emotional stress of having

5    $300,000 stolen and our retirement funds devastated, the

6    stigma of trusting Karen and having that trust betrayed

7    has left us with questions about our ability to discern

8    unscrupulous people and opportunities."

9        "This was inherited money from my mother and

10    father.  Some of it belonged to the family trust, which

11    includes myself and my two sisters.  Even writing this

12    statement is like tearing duct tape off an open wound.

13    Although our financial loss may not be as large as others,

14    in our, my sister's and I world, this is a huge loss.

15    There has been a noticeable increase in anxiety, not

16    knowing what our financial outcome may be.

17        I have also noticed an increase level of skepticism

18    that I never felt before.  My trust in humanity is quickly

19    disappearing.  I have been emotionally torn apart by

20    this."

21        "The principal amount was planned to be used to buy

22    a house for retirement.  I was hoping to have been able to

23    retire by September of 2017.  Now that this money is lost,

24    I have no idea if or when that may happen."

25        So those are just a few of the victim impact

1    statements that were submitted that I felt were worthy of

2    being put on the record.

3          The Government has filed Document 20, the

4    Government's motion for a variant sentence of 65 months

5    based on the defendant's cooperation.  That would be

6    greater than a 52 percent reduction from the

7    bottom-of-the-advisory guideline range, as I believe has

8    been properly calculated.

9          The Government indicates that Ms. McClaflin's

10   efforts to aid the Government in its resolution of the

11   case have been substantial and unusual and warrants a

12   variant sentence.

13         In addition to meeting with the Government and

14   confessing to her crimes, Ms. McClaflin agreed to plead

15   guilty to an Information rather than requiring an

16   Indictment, which the Government indicates allowed it to

17   charge this case much more quickly than usual.

18         The Government also indicates, and the Receiver

19   testified here today, that Ms. McClaflin has been actively

20   providing information and locating documents to assist the

21   Government and the Receiver in its loss and restitution

22   calculations and to liquidate the estate to the benefit of

23   the recipients of those moneys.

24         She has stipulated that the loss and restitution in

25   this case exceeds 14 million, although apparently there is

1    a dispute over about 90,000 of that amount.

2            The Receiver in the El Paso County District Court

3    civil case did testify today.  He has reported that

4    Ms. McClaflin's assistance in the investigation has been

5    invaluable.  And I will agree with him and with everybody

6    else that this is a very unusual case.

7            Normally, in these cases, I find that the

8    defendants have either not kept records or have shredded

9    everything they can, and it is very difficult to put

10   together the records to show what has been invested, what

11   has been lost, and then to liquidate the assets.  And

12   generally investors receive maybe 10 cents on the dollar.

13           The Receiver in this case noted that her assistance

14   in deciphering her business records and which assets could

15   be liquidated in order to pay the investors was extremely

16   helpful.  And he believes that without her assistance it

17   could have taken years to determine the financial portion

18   of this offense.

19           He was appointed by the El Paso County District

20   Court to dissolve the defendant's company, and thus far

21   has recovered 6.4 million.  Unfortunately, it appears that

22   there is a real squabble over most, if not all, of that

23   from the deeds of trust that were forged by Ms. McClaflin

24   and put into the hands of the investors for the bank.

25           It was interesting to read that FBI Agent John

1    Cronan indicated that the Ponzi scheme that the defendant

2    was conducting was different from the average Ponzi scheme

3    because the defendant did not pocket much of that money,

4    nor did she close down her business and take the money and

5    flee the jurisdiction.

6         He indicates that she has accepted responsibility

7    for her actions and has provided invaluable assistance to

8    the FBI in this offense.

9         In the majority of these types of cases, the

10   victims are rarely made whole.  I am hoping that there

11   will be prevailing outcomes with respect to Integrity

12   Bank, and that the investors here will be made somewhat

13   whole, if not entirely whole.

14        But I also noted that despite this assistance, the

15   Government objects to the presentence report, indicating

16   that Ms. McClaflin and her husband "divorced about one

17   month after her fraud was discovered."  Yet, both continue

18   apparently to reside in the same house, and her husband

19   has admitted that the primary reason for the divorce was

20   to secure his assets, and states that he hopes to stay

21   together with the defendant, because he still loves her.

22        The Government also indicates that Ms. McClaflin

23   has failed to account for personal assets.  The Court sees

24   this as hardly behavior of a defendant who is truly sorry

25   for her conduct and wishes to make her victims whole.  As

1    usual, it appears she is looking out for her own best

2    interest.

3        Therefore, based on my review of this case, and

4    after consideration of the 3553(a) factors, especially the

5    nature and circumstances of this offense, I would normally

6    not be inclined to vary or depart at all from the advisory

7    guideline range.

8        However, based on the conduct of Ms. McClaflin post

9    discovery of her fraud, I am inclined to grant a variant

10   sentence, but not one as low as that requested by the

11   Government.

12       If I had determined that there was insufficient

13   evidence to apply the 6-level enhancement of United States

14   Sentencing Guideline Section 2B1.1(b)(2)(C) in this case,

15   the advisory guideline range would have been 87 to 108

16   months.

17       In such a case, I would not have granted any

18   variant sentence, because despite her cooperation, I think

19   that range is sufficient, but not greater than necessary,

20   to meet the objectives of sentencing.

21       However, because of her cooperation, and the fact

22   that it is at least allowing assets to be put into the

23   hands of someone who will not dissipate them, while I am

24   inclined to deny the Government's motion, I am inclined to

25   grant a variant sentence somewhere within that adjusted

1    advisory guideline range had I not applied 2B1.1(b), so in

2    the guideline range of 87 to 108 months, because I believe

3    that is a sufficient, but not greater than necessary,

4    sentence.

5         However, I have not yet decided where within that

6    range of 87 to 108 months the sentence should actually be.

7    I am inclined to impose 3 years of supervised release,

8    with all of the special conditions, including the

9    restitution, as I indicated, in the amount of

10   $14,528,206.39 to the victims, as set forth in the

11   presentence report.

12        So, the sentence would run concurrently.  It would

13   be imposed as to both Counts 1 and 2, to be run

14   concurrently, and the supervised release to also be run

15   concurrently.

16        With that being said, Mr. Hammond, I will hear from

17   you, then I will hear from Ms. Rhyne, then, finally, if

18   Ms. McClaflin wishes to make any statement to me on her

19   own behalf, I will hear from you.

20        MR. HAMMOND:  Your Honor, I have heard the Court

21   talk about property that was misleading, or something like

22   that.  And I am going to assume -- so I am asking

23   direction from the Court -- that that had to do with the

24   vehicles that were mentioned?

25        THE COURT:  There were the vehicles that were

1    objected to, and then whatever -- I don't know what has

2    happened with this "divorce."

3        MR. HAMMOND:  Well, I can tell you, as far as the

4    vehicles go, the 2006 ML350 has been sold, and that was, I

5    believe, that was purchased in 2006.  It was sold as part

6    of the down payment -- or the payment on a 2011 ML350 that

7    belongs to Mr. McClaflin.  I am sorry, Mr. Strange.

8        The 2010 Audi SE coup was sold in 2017 to pay for

9    attorney fees.  The 2014 Audi Q5 belongs to Mr. Strange.

10   I don't know if that helps the Court or not.

11       THE COURT:  A bit.  But we have been going for 2

12   hours.  I need to give Ms. Martinez a break from typing.

13   So we are going to take a 15-minute break.  We will

14   reconvene at 1:15.

15       (A break is taken from 12:58 p.m. to 1:11 p.m.)

16       THE COURT:  You may be seated.

17       Mr. Hammond, you may proceed.

18       MR. HAMMOND:  Your Honor, I think the last place I

19   left off was about the personal property.  And my question

20   for the Court was, did that sufficiently answer the

21   Court's questions.

22       THE COURT:  Well, it did as to those vehicles, but

23   I don't know what other personal property is out there.

24       MR. HAMMOND:  And that's why I asked that question.

25   I am not aware of any other personal property that has

1    been mentioned besides the automobiles.

2        THE COURT:  All right.  And then the real property

3    that got split up in the divorce, I don't know much about

4    that.

5        MR. HAMMOND:  And I anticipate, or I'm going to

6    inform the Court that as far as I can tell about the

7    divorce, I think the divorce was something that

8    Ms. McClaflin initiated, in large part, because she had

9    betrayed her husband, as well as the rest of the people in

10   this room.  And in terms of feeling like she had to do

11   what she had to do, that is how the divorce came about.

12       I think that they don't have the same relationship.

13   I think that Mr. Strange cares deeply for her.  I think

14   she cares deeply for him.  But, as many of the people told

15   you this morning, it has caused severe marital problems,

16   and hers is one of the -- part of the wreckage of this

17   whole thing.  I don't know if that helps the Court with

18   respect to that, either.

19       One of the things that I don't believe you know, is

20   that while all of this has been going on, just before or

21   just after Ms. McClaflin was -- I think it was before,

22   because it was in March, before she was charged by

23   Information, her mother died on March 28, 2017.

24       It was after Ms. McClaflin had gotten out of the

25   hospital on her seventh surgery.  She had taken care of

1   her mom, taken care of her dad.  She was very close with

2   her dad.  He is also -- he was also a victim.  He had been

3   hospitalized.  He got out of the hospital and was doing

4   pretty well, and I think it was a massive heart attack,

5   and he died on September 23, 2017.

6          So, the train wreck basically continues for

7   everybody.  The loss continues for everybody.  Financial

8   loss, the emotional loss.

9          I will tell you, as I started to say earlier this

10  morning at the very beginning, this is the first case that

11  I have seen in my practice, that started in 1993 in the

12  federal court, that the probation office recommended a

13  downward variance based on everything that was done, and

14  it was a substantial downward variance.  And it was a

15  variance of 60 months.

16         It is the first time I have seen, in the time that

17  I have been practicing in the United States District

18  Court, that the Government recommended a significant

19  downward variance on sentencing.  And I think, as I said,

20  there are -- well, I didn't get that far, so I will start

21  now.  I think there are four extremely relevant facts why

22  that happened, and I want the Court to consider them.

23         When Ms. McClaflin was confronted by the investors

24  who were associated with the bank, she admitted what she

25  had done and what she had been doing.

1        Second, when the Receiver was appointed by the El

2   Paso County District Court, Ms. McClaflin was committed to

3   assisting the Receiver in sorting through the documents

4   and organizing all of the HomeSource material and business

5   records and assisting the Receiver in how everything

6   worked and how it started and how it would unravel.

7        Third, she agreed that she would assist the

8   Government.  She agreed to assist FBI agents.  She agreed

9   to assist IRS agents.  She agreed to assist anyone in law

10  enforcement who had a question at any time they had a

11  question.

12        When I was contacted on this case, there was a

13  meeting in the U.S. Attorney's Office.  I expressed my

14  constant concern about my client speaking to government

15  agents without my being present.

16        But it became very clear that there were things

17  that had to be discussed in Colorado Springs that I

18  couldn't get there, the timing was something that had to

19  be resolved.  And the agents who called me said, do you

20  mind if I talk to Ms. McClaflin, and I said, go ahead and

21  do that.  She has been there for everything they have

22  asked about.  She has cooperated in every way possible.

23        And, fourth, beginning in about 2011,

24  Ms. McClaflin's body went through hell.  She started

25  having medical issues with her hip.  And, as you have

1    heard, she has now had 11 surgeries, and there may be

2    more.  The likelihood -- it is more likely than not that

3    there will be more surgeries.

4           She has lost 30 to 40 pounds since 2011 based on

5    her medical condition.  And it is interesting, because

6    that explains a lot of how this happened.  As Agent Cronan

7    said in the presentence report, this case is unique,

8    because in any kind of a Ponzi scheme, the defendant takes

9    the money, the defendant buys lavish things for himself or

10   whoever he wants to.  The defendant goes out and takes the

11   money or runs with the money and is never heard from

12   again.  They spend it.

13          She didn't spend it.  What she was doing was trying

14   to keep things afloat.  The Court noted, the issue about

15   Ms. McClaflin's partner and how he had -- he got out of

16   the business.  He saw what was happening, and he declared

17   bankruptcy and cut the losses.

18          She didn't do that.  The reason she didn't do that

19   wasn't because she wanted to keep a scheme going for

20   herself, it was so everybody would get back what they put

21   in.  That is why she kept doing it and kept doing it.  She

22   convinced herself that if she could do that, at some point

23   the economy was going to get better.  At some point, it

24   was going to turn.  And, in deed, it has.  And the values

25   were going to go up, and she was going to be able to pay

1    those folks.

2         How she did it was, to put it mildly, a mistake.

3    What she did was wrong.  The manner in which she did it

4    was wrong.  What she -- the goal she wanted to accomplish,

5    that was not wrong.

6         I have seen so many of these cases involving fraud

7    that -- and I have done them in front of this Court, and

8    we are familiar with each other.  I just did a sentence in

9    front of you 2 months ago.  You know my style.

10        I have seen these cases, and this is unique.  That

11   is why probation did what they did.  That is why the

12   Government did what they did.  That is why I would ask you

13   to reconsider, because I think she can still help.  She

14   can still help the Receiver.  She can still help whoever

15   needs to get the help, to get money back to those who

16   deserve to get their money back.

17        But I cannot stress enough that what happened was

18   she was working in a bad economy.  She kept trying to get

19   more money so she could pay people on the front end so

20   that she would have the money to get it when the economy

21   got better to pay them on the back end.

22        And she was able to juggle those balls.  She was

23   able juggle those for a number of years, until she got

24   sick, until she started having surgeries, and then she

25   couldn't keep doing it.  She couldn't keep her -- she

```
 1    couldn't get focused.  She couldn't even go to work.
 2         The business plan -- there were people who did due
 3    diligence, and they did check it out.  And someone
 4    testified earlier, that told you earlier this morning,
 5    they went with the most cynical person, and that person
 6    said, she is sitting on a gold mine.
 7         And the business plan made sense.  The problem was,
 8    the business plan started to fall.  And instead of doing,
 9    as her partner did, and declaring bankruptcy and cutting
10    the losses, maybe for them, but certainly for him,
11    Ms. McClaflin was trying to make sure that everybody got
12    taken care of.
13         THE COURT:  The ends do not justify the means.
14         MR. HAMMOND:  I understand.
15         THE COURT:  They don't.
16         MR. HAMMOND:  And I have said that it was wrong.
17    But, I think -- and I know this Court knows that this is a
18    different kind of case.  I'm willing to bet that this
19    Court has never seen a scheme like this.
20         THE COURT:  I have never seen a defendant
21    cooperate, which is why I am willing to vary somewhat.
22         MR. HAMMOND:  Okay.  But does the Court also agree
23    -- well --
24         THE COURT:  Everybody comes here and tells me, for
25    the most part, that we were just trying to get them their
```

1    money back.

2          MR. HAMMOND:  Right.

3          THE COURT:  I had one of those, what, 2 or 3 years

4    ago, a lawyer who did it.

5          MR. HAMMOND:  I understand.

6          THE COURT:  So, yeah, but you did this fraudulent

7    scheme.  How much extra work did it take to develop all of

8    these false documents to keep her scheme going?  I mean,

9    she put an awful lot of time and efforts into falsifying

10   things, as opposed to doing something constructive.

11         MR. HAMMOND:  And, I am sorry, I am not sure what

12   was constructive.  She did --

13         THE COURT:  There wasn't anything constructive.

14         MR. HAMMOND:  Well, and I understand that the end

15   result was bad.  I am not arguing with the Court on the

16   ends justifying the means.  I am not doing that.  What I

17   am saying is, you know that that other person who was

18   sentenced before you didn't mean it.  You know that that

19   other person was, as you were talking about, was involved

20   in their own personal greed.

21         You can look through these things, and I think the

22   agents told you in the presentence report, that they

23   believe that that was what the motive was to keep this

24   going.  That is what they believe the motive was.  That is

25   unique in this jurisdiction, and I believe every

1    jurisdiction in the country.  That, I think, is important.

2          The fact is, as I said before, her body began to

3    betray her.  She got sick.  And I know the Court is

4    considering the fact that even though she has had a number

5    of surgeries, even though she has had a number of

6    infections that had to be treated, even though this is

7    ongoing, she still went into the office and assisted the

8    Receiver and the Receiver's assistant every day that she

9    could.  She went in and assisted the agents every day that

10   she could.  She went and did everything that she could.

11         I can probably guarantee -- I don't know, I don't

12   have a crystal ball, but I can probably guarantee that

13   that person who got sentenced last before you, didn't go

14   in and cooperate with the agents, didn't go in every day

15   with the Receiver and try to make sense of the records and

16   put them straight so that those people would not only get

17   paid, but tried to make it sooner rather than later.

18         That is another thing that is interesting, I think,

19   about this case, because as you were talking about that

20   other person, there is a certain amount of arrogance that

21   people have when they think that they can get away with

22   something.  In this case, I don't think the failure was

23   arrogant.  And I don't think the human failure was

24   arrogance.  I think the human failure was vanity.  I think

25   the human failure of vanity was that she thought she could

1    get there on the other side, and it didn't happen.

2        There were people who, I believe, appealed to that

3    sense of vanity when they came to her and said, look, we

4    can give you a whole lot of capital, but you have to

5    consolidate all of those with us and put us first.  And I

6    think that appealed also to the vanity.  And I think that

7    is a different factor than the arrogance that you normally

8    see.

9        Everyone agrees, I think, in this case, that the

10    guidelines really don't work.  This is not a guideline

11    sentencing case.  You have the authority to issue a

12    different kind of sentence.  You can create a sentence

13    that will provide an adequate amount of punishment under

14    18 U.S.C. 3553.  The other needs that she has, which are

15    primarily her medical needs, and the needs that I believe

16    that the Receiver told you that he had to maintain contact

17    and communication with her.

18        I think that the Court has already indicated that

19    there will be a sentence to the Bureau of Prisons.

20    Assuming that that happens, I am just trying to remember

21    to do this now rather than later, I am going to ask that

22    you recommend a sentence to a federal medical center.

23        THE COURT:  All right.  Thank you.

24        Ms. Rhyne, do you wish to have the podium?

25        MS. RHYNE:  If I could, Your Honor.

```
 1          THE COURT:  All right.  If you can have a seat.

 2          MS. RHYNE:  Your Honor, I would like to preface for

 3     my remarks, so they are not confusing or perceived as

 4     disrespectful by the Court, but there is Tenth Circuit

 5     authority that says the Government can't argue for a

 6     sentence that was not contemplated by the plea agreement

 7     or is in conflict with the plea agreement.

 8          So, I hear the Court's directive that I am to argue

 9     for what the appropriate sentence is between 87 and 108

10     months, which would have been the calculation the parties

11     came up with absent any downward variance requested by the

12     Government.  So I am going to use that terminology.  It is

13     not because I misunderstand, it is just trying to --

14          THE COURT:  Well, actually, I had a question about

15     that, because I thought her plea agreement said that she

16     would waive her right to appeal only if her guideline

17     sentence was with an offense level 27, not 29.  So I

18     wasn't quite sure what had really been agreed to.

19          MS. RHYNE:  I think that represents the

20     acknowledgment in the calculation that she was not

21     agreeing to the 2-level enhancement for the more than $1

22     million.

23          THE COURT:  All right.

24          MS. RHYNE:  And I may be overly cautious, Your

25     Honor, I just don't want the Tenth Circuit to find that I
```

 1    have breached the plea agreement.

 2         THE COURT:  Okay.

 3         MS. RHYNE:  Be that as it may, understanding your

 4    construct of where should she be sentenced within 87 to

 5    108 months, the Government does believe she should be

 6    acknowledged or rewarded for her efforts, which have been

 7    long talked about in this hearing, so I won't go over it.

 8         THE COURT:  And your recommendation was essentially

 9    a 25 percent downward variance.

10         MS. RHYNE:  That was the intention based on the

11    calculation in the plea agreement.  So, yes, that is the

12    rubric.  So the Government would ask that between the 87

13    and 108 months, she be sentenced to 87 months, because at

14    least under my rubric, that would be a low-end guideline

15    sentence, understanding that the Court would view that as

16    a variant sentence.  But that is going to be my position.

17         Not only that she substantially helped in this

18    case, both in putting loss calculations together, but also

19    the Receiver has indicated, in wrapping things up.  And I

20    know it is not expedient in the eyes of most people, but

21    federal litigation and, apparently, state litigation,

22    often takes a long time.  And to get this case from a

23    charging document to a sentencing in a year is actually

24    pretty fast.

25         And I would like to comment, one of the reasons

1    that the Government was willing to go forward early on and

2    perhaps cut a deal before it had all of the facts, was

3    because I, too, have litigated these cases, and I have

4    seen them when they take a year to 2 years to charge,

5    because we need to get all of the bank records and make

6    sure we have everything, and another year to 2 years to

7    sometimes 3 years to go to trial, and another 3 to 7 to 8

8    months to sentence.

9        And there we are -- my math is not quite up to

10   speed yet -- but maybe 5 years later, the defendant is

11   being sentenced, the victims haven't received restitution,

12   and there is no money left.

13       And that is something I see frequently in large

14   white collar cases.  That was why the Government was

15   willing to go forward quickly, with the idea that she was

16   wanting to confess, plead guilty, and assist the case,

17   even at the expense of the 4 levels that the Court has

18   found that the Government missed.  And I appreciate the

19   Court's disagreement there.

20       But that is where those compromises get made,

21   because in looking at the lay of the land, what do we

22   think is the best approach to serve justice in the bigger

23   picture, and that is the compromise the Government made.

24       And, so, with that in mind, at least an 87-month

25   sentence does acknowledge her assistance in cooperating,

 1    which was valuable, and we want to encourage any other

 2    defendant who might be willing to do that, to do so in the

 3    future.  And if there was a message from this case, that

 4    that would not be rewarded, that becomes an even less

 5    likely result for the future.

 6         So, that is the Government's position.  You have

 7    heard from the victims.  You understand fully the impact

 8    of this case, but that is the Government's position.

 9         THE COURT:  All right.  Thank you.

10         All right.  Mr. Hammond, would you and

11    Ms. McClaflin please retake the podium.

12         Ms. McClaflin, do you wish to make any statement to

13    me on your own behalf before I impose sentence?

14         THE DEFENDANT:  Yes, Your Honor, I do.

15         THE COURT:  You may.

16         THE DEFENDANT:  This is really tough.  I guess one

17    of the first things that I want to say, and this is really

18    to the victims, is just how sorry I am that we're here

19    today; that I made such a mess of things, because I never

20    set out to hurt anybody.  I really screwed up.  I tried to

21    make it right, and in my desperation in trying to make it

22    right, I crossed the line, and I did some illegal things

23    that I should not have done.

24         I did a lot of things right, but I did a lot of

25    things wrong, and that is why I'm here today.

1          One of my co-workers was suspected of altering an

2     ownership and encumbrance report that was provided to one

3     of our investors, and when they questioned her about it, I

4     went to them and admitted that it was me that had done

5     that and not her, and that is what brought down the whole

6     kind of crash of HomeSource, if you can call it that.

7          All of these years, I have tried so desperately to

8     hold this up, believing, genuinely believing, given enough

9     time, that I could make it right.  And I realize now, over

10    the last 13 months, in working with Denise, who works for

11    the Receiver, and she and I meet over at the office, and

12    going through all of the records and holding each of the

13    investor files, I see I see their faces.

14         I see the Jacksons.  I see the Tinkles.  I see

15    their victim impact statements, because I have read them

16    over and over and over, and even the ones that you have

17    read, I could tell you who wrote each one, because I have

18    read them so often.

19         And I know that the pain that they wrote in those

20    impact statements is the same pain that I carry, because I

21    am responsible.  I am the one that did this.  I took money

22    from, you know, that I shouldn't have, from my marital

23    assets, that I never told my husband about, and plowed it

24    into the company to make sure everybody was getting their

25    payments, and that nothing was wrong, because I needed to

1    buy time to make it right.

2         My dad is a victim of HomeSource.  My husband is a

3    victim of HomeSource.  My friends, and the people who are

4    standing here, sitting behind me, were my friends.  And I

5    didn't befriend them so -- some of them became friends

6    after they were investors.

7         But I didn't befriend Paula Greco so that she would

8    be an investor.  She was my friend.  I was just unable to

9    call and talk to anybody after this whole thing happened,

10    and I wanted to so desperately, to reach out and talk to

11    everybody and tell them how sorry I was and how hard I was

12    working to try and get them their money back, and that I

13    continued to try to get them their money back.

14         And by working with Denise and working with the

15    Receiver and this lawsuit, and claw backs, I believe we

16    have a really good shot in making these people whole.  And

17    I don't want to stop until they are whole.  I mean, I

18    can't.  I can't stop.

19         And I wake up with it in the morning.  I go to bed

20    with it at night.  It is all encompassing to me.  I told

21    one of the, I think it was Mr. Sims, said that I had told

22    him that I never lost a dime of money for anybody, and I

23    hadn't.  And I never intended to.

24         THE COURT:  But you had.  You had lost it.  And you

25    defrauded others to try to make it look like you didn't.

```
 1              THE DEFENDANT:  I guess that is right.  I didn't
 2    see it that way at the time, but it was like the wrong
 3    words seemed to rhyme.  And I thought, just another couple
 4    of years, I can make this right.  And I realize now how
 5    unrealistic that was.
 6              I am so -- I am ashamed.  If there is one good
 7    thing about my dad passing in September, it is that he is
 8    not here to see my shame.  And I am doing everything I
 9    know to do to try and make this right for everybody.  And
10    I don't want these -- any of these investors to lose a
11    dime.
12              And I want -- I will spend the rest of my life
13    making restitution, until everybody is okay.  Whether it
14    comes from this court case, whether it comes from me
15    working and making it happen that way, I won't stop until
16    they are okay.
17              And I'm just so sorry.  And it is my fault.  I take
18    complete responsibility for it.  I always have.  It is no
19    one else's fault but mine.  I created HomeSource, and I
20    destroyed HomeSource.  And I never meant to destroy all
21    these people and the lives in between.  Never intended to
22    do that, never.
23              And it is very painful to hear what -- you know,
24    when they get up here and talk, because I care very much
25    about them.  And what -- my actions have, you know, hurt
```

1    them.  And it is not who I am.  And I wish I could go back

2    and never have started HomeSource, and stayed a realtor,

3    and just had had my simple little company, and done things

4    correctly, like we always had.

5        The little real estate company was perfect.  And

6    then when HomeSource started, then everything was -- it

7    was like there was a cancer, and I couldn't cure it.  I

8    couldn't.  And I should have stopped.  And my big mistake

9    was to continue.  I never should have continued, and I

10   should have stopped.

11       And, you know, at that point, there is a lot of

12   things I should have done that I didn't do.  But what I

13   can do is to continue to help the Receiver for as long as

14   this Court will allow me, and in helping to get as much

15   money back for these investors as I possibly can.  And

16   that is what I intend to do for as long as I can.

17       THE COURT:  All right.  As a result of the United

18   States Supreme Court's rulings in United States v. Booker

19   and United States v. Fanfan, the United States Sentencing

20   Commission Guidelines have become advisory to this Court.

21   Although this Court is not bound to apply those

22   guidelines, it has consulted them and taken them into

23   account, along with the sentencing factors set forth at 18

24   United States Code Section 3553(a).

25       The Court finds that the 6-level enhancement

 1    pursuant to United States Sentencing Guideline

 2    2B1.1(b)(2)(C) does apply in this case.  The Court

 3    determines that no finding is necessary concerning the

 4    remaining objections to the presentence report, because

 5    the controverted matters will not be taken into account in

 6    imposing sentence, nor will they affect the sentence that

 7    the Court imposes.

 8         Neither the Government nor the defendant has

 9    challenged any other aspect of the presentence report,

10    therefore, the remaining factual statements and guideline

11    applications are adopted without objection as the Court's

12    findings of fact concerning sentencing.

13         The Court finds that the total offense level is 33.

14    The defendant's Criminal History Category is a I.  That

15    results in an advisory imprisonment range of 135 to 168

16    months, and a fine range of $17,500 to $29,056,412.78.

17    The supervised release range is not more than 3 years.

18         The Court denies the Government's motion for a

19    variant sentence of 65 months.

20         However, for the reasons previously stated by this

21    Court, in particular, the cooperation of the defendant

22    post discovery of her criminal fraudulent scheme, the

23    Court finds that a variant sentence is warranted in this

24    case.

25         Pursuant to the Sentencing Reform Act of 1984, it

1    is the Judgment of the Court that the defendant, Karen

2    Lynne McClaflin, is hereby committed to the custody of the

3    Bureau of Prisons to be imprisoned for a term of 96 months

4    on Counts 1 and 2, to run concurrently.

5        Upon release from imprisonment, she shall be placed

6    on supervised release for a term of 3 years on Counts 1

7    and 2, both terms to run concurrently.

8        Within 72 hours of release from the custody of the

9    Bureau of Prisons, she shall report in person to the

10   probation office in the district to which she is released.

11       While on supervised release, she shall not commit

12   another federal, state, or local crime; shall not possess

13   a firearm, as defined in 18 United States Code Section

14   921; and shall comply with the standard conditions that

15   have been adopted by this Court in General Order 2016-1.

16       She shall not unlawfully possess a controlled

17   substance.  The Court waives the mandatory drug testing

18   provisions, because the presentence report indicates a low

19   risk of future substance abuse by this defendant.

20       She shall cooperate in the collection of DNA as

21   directed by the probation officer.

22       The Court finds that the following special

23   conditions of supervision are reasonably related to the

24   factors set forth at 18 United States Code Sections

25   3553(a) and 3583(d).

1          Further, based on the nature and circumstances of

2    this offense and the history and characteristics of this

3    particular defendant, these conditions do not constitute a

4    greater deprivation of liberty than reasonably necessary

5    to accomplish the goals of sentencing.

6          The defendant shall make restitution in the total

7    amount of $14,528,206.39 to the victims, and in the

8    amounts indicated in the presentence report.  Each victim

9    shall receive an approximately proportionate payment based

10   on victim's share of total loss.  Any disbursements

11   returned to the Clerk of the Court as unclaimed or

12   undeliverable shall be deposited into the Court's registry

13   and disbursed to the remaining victims on a pro rata

14   basis.

15         Restitution is ordered and directed to the

16   addresses provided to the Clerk of the Court by the

17   probation officer.  The Court has determined that the

18   defendant does not have the ability to pay interest, and

19   it is ordered that the interest requirement is waived for

20   the restitution.

21         The defendant shall not incur new credit charges,

22   open additional lines of credit, or obtain or entering

23   into any financing agreement or arrangement without the

24   approval of the probation officer unless the defendant is

25   in compliance with the periodic payment obligations

1    imposed pursuant to the Court's judgment and sentence.

2           As directed by the probation officer, the defendant

3    shall apply any moneys received from income tax refunds,

4    lottery winnings, inheritances, judgments, and any

5    anticipated or unexpected financial gains to the

6    outstanding Court-ordered financial obligation in this

7    case.

8           The defendant must provide the probation officer

9    with access to any requested financial information, and

10   authorize the release of any financial information to the

11   probation officer until all financial obligations imposed

12   by the Court are paid in full.

13          She shall make payment on the restitution

14   obligation that remains unpaid at the commencement of the

15   supervised release.  Within 60 days of release from

16   confinement, she shall meet with probation officer to

17   develop a plan for the payment of restitution.  She shall

18   work with the probation officer in the development of a

19   monthly budget that shall be reviewed with the probation

20   officer quarterly.

21          She shall document all income, compensation, and

22   financial support generated or received from any source,

23   and provide that information to the probation officer as

24   requested.  The plan of payment will be based upon

25   defendant's income and expenses, with the restitution

1    amount to be paid in monthly installment payments.  Such

2    monthly installment payments shall be at least 10 percent

3    of the defendant's gross monthly income.

4         Because this sentence imposes restitution, it is a

5    condition of supervision that she pay in accordance with

6    this Order.

7         All employment must be approved in advance by the

8    probation officer, and the defendant shall not engage in

9    any business activity unless approved by the probation

10   officer.  All approved business activity must operate

11   under a formal registered entity, and the defendant shall

12   provide the probation officer with a business entities and

13   their registered agents.

14        She shall maintain business records for any

15   approved business activity and provide all documentation

16   and records as requested by the probation officer.

17        She shall maintain separate personal and business

18   finances and shall not commingle personal and business

19   funds or income in any financial accounts, including, but

20   not limited to bank accounts and lines of credit.

21        If she has an outstanding financial obligation, the

22   probation officer may share any financial or employment

23   documentation relevant to the defendant with the Asset

24   Recovery Division of the United States Attorney's Office

25   to assist in the collection of the obligation.

1          She shall pay a special assessment of $200.  The
2     Court finds that the defendant does not have the ability
3     to pay a fine, so the Court waives the fine in this case.
4          It is ordered that the payment of the special
5     assessment and restitution obligations are due and payable
6     immediately.  Any unpaid restitution balance upon release
7     from incarceration shall be paid in monthly installment
8     payments as previously described by this Court.
9          Pursuant to Rule 32.2 of the Federal Rules of
10    Criminal Procedure and the defendant's admission to the
11    forfeiture allegation contained in the Indictment -- or it
12    in the Information, rather, the defendant shall forfeit to
13    the United States any and all property, real or personal,
14    derived from proceeds from the instant offense.
15         Now, Ms. McClaflin, I want you, and I want
16    everybody in the audience to know that I take my task of
17    sentencing very seriously.  As you can see, I have spent
18    hours and hours on this case.  Because, on one hand I want
19    to be fair to you, because I understand I have impacting
20    your life by the sentence I impose.  But I also have an
21    obligation to the public and to society to protect them
22    from further crimes by you and by others, to promote force
23    the laws of the United States, and to impose a sentence
24    that is going to deter you and others from committing
25    similar criminal conduct.

1          Now, in this particular case, I just cannot fathom

2     how you could look at people and pretend to be their

3     friend, and then take their money, knowing they were never

4     going to get it.  Because while you may have had this

5     pie-in-the-sky thought that you could do it, this went on

6     for years.

7          You knew you were in way over your head.  And you

8     looked at them and you lied to them, and then you

9     fraudulently did documents when the bank came to you and

10    said, we want our investors in the first place, you took

11    them out of that position and put these others in that

12    place.  I just can't imagine how anyone, who has any

13    conscience, could do that.

14         I gave you a break here because you did cooperate,

15    otherwise you would have been looking at spending probably

16    the 135 months in prison, more than 10 years.  I gave you

17    a break which is equal to approximately the 25 percent

18    that the Government was seeking for your cooperation.

19         And, normally, I will tell you the truth, I take

20    these fraudulent white collar fraud crimes very seriously,

21    because, I think that, for the most part, the guidelines

22    really slap defendants who sell drugs, as it should, and

23    others very hard, and they give people like you a slap on

24    the wrist.  But you took $14 million, and you destroyed

25    the lives of all of these people.

1          I think that the 135 of the original range that

2     came up here was a sufficient, but not greater than

3     necessary, sentence.  And if you hadn't cooperated, I

4     would have probably given you a sentence at the top of

5     that guideline.  But, because you cooperated, and this

6     case is unique because of that.  Most of the other cases,

7     the money is gone, the defendant won't help.  I am hopeful

8     that your victims will get at least some money back.

9          And I am hopeful that the Receiver and the attorney

10    are going to be able to help do that.  But, for some of

11    them, it is going to be too late.  They are elderly.

12    Their parents are elderly.  And it is going to take years

13    to unravel the mess that you made.

14         I do believe that this sentence of 96 months of

15    imprisonment, with the 3 years of supervised release and

16    the restitution, does reflect the seriousness of this

17    offense and is a sufficient, but not greater than

18    necessary, sentence to achieve the objectives of

19    sentencing.

20         Now, Ms. McClaflin, although you waived your right

21    to appeal the under the circumstances outlined in your

22    plea agreement, to the extent that you have not waived

23    your right to appeal, you are advised that if you desire

24    to appeal, a Notice of Appeal must be filed with the Clerk

25    of the Court within 14 days after entry of Judgment or

```
1    your right to appeal will be lost.
2           If you are not able to afford an attorney for an
3    appeal, one will be appointed to represent you.  And, if
4    you request, the Clerk of the Court must immediately
5    prepare and file a Notice of Appeal on your behalf.
6           I guess I need to ask Ms. Rhyne, are you wanting me
7    to remand immediately, or are you willing to allow
8    Ms. McClaflin to voluntarily surrender?
9           MS. RHYNE:  Your Honor, we agreed to allow her to
10   voluntarily surrender.
11          May I make a point as to the order of forfeiture,
12   Your Honor?
13          THE COURT:  Yes.
14          MS. RHYNE:  On April 25, 2018, you entered a
15   preliminary order of forfeiture, and I wanted a
16   clarification that you are making it a final order of
17   forfeiture as of your Order today.
18          THE COURT:  Yes.
19          MS. RHYNE:  Thank you, Your Honor.
20          THE COURT:  All right.  The Court does find that
21   the defendant's bond conditions do reasonably assure that
22   she will not flee or pose a danger to the safety of any
23   other person or the community.  And, as such, I hereby
24   allow Ms. McClaflin to remain free on bond, subject to the
25   same conditions as set forth in her Order setting
```

     1    conditions of release.

     2         It is ordered, however, Ms. McClaflin, that you

     3    will surrender to the institution designated by the Bureau

     4    of Prisons before noon within 15 days of the date of

     5    designation.  Your bond is exonerated at the time of your

     6    voluntary surrender at the institution designated by the

     7    Bureau of Prisons.

     8         I am directing you, immediately after this hearing,

     9    to go down to the third floor of this building, to the

    10    Marshal's Office, and fill out the self-surrender card

    11    with them.

    12         Is there anything further, Mr. Hammond?

    13         MR. HAMMOND:  Your Honor, as I said earlier, I

    14    would ask the Court to consider designation to a federal

    15    medical center.  I met the former chief of designations

    16    for the Bureau of Prisons last year at a Sentencing

    17    Commission seminar here in Denver.

    18         It is my understanding, from the brief conversation

    19    I was able to have with him, that a designation to an FMC

    20    would be the best.  He suggested Carswell.  I also learned

    21    from that seminar that a specific designation to a

    22    specific institution isn't as easy to do, but a general

    23    designation to a medical center is considered by the

    24    Bureau of Prisons.

    25         THE COURT:  All right.  I am not willing to make

1    that recommendation.  I think the Bureau of Prisons can

2    sort out whether she really does have serious medical

3    issues that are different from any of the other defendants

4    that they see on a regular basis who have medical issues.

5    So I am not willing make that designation or that

6    recommendation to the Bureau of Prisons.

7          Nothing further, then Court will be in recess.

8          (Proceedings conclude at 1:51 p.m.)

9

10          **R E P O R T E R ' S    C E R T I F I C A T E**

11

12          I, Darlene M. Martinez, Official Certified

13   Shorthand Reporter for the United States District Court,

14   District of Colorado, do hereby certify that the foregoing

15   is a true and accurate transcript of the proceedings had

16   as taken stenographically by me at the time and place

17   aforementioned.

18

19          Dated this 24th day of May, 2018.

20

21          _____

22          s/Darlene M. Martinez

23          RMR, CRR

24

25