IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  17-cr-00168-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  KAREN MCCLAFLIN,

      Defendant.

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE OR HOME CONFINEMENT [DOC. # 117]**

      The United States respectfully submits this response in opposition to the Defendant's Motion for Compassionate Release or Home Confinement [Doc. # 117].  The defendant's motion is based primarily on COVID-19 and her concerns that she is at a higher risk because of a supposed autoimmune disorder, thyroid disease, and that she is a former smoker.  Because the defendant has not made any request to the Bureau of Prisons for compassionate release based on concerns regarding COVID-19, she has failed to exhaust her administrative remedies.  Even if the Court finds that the defendant need not exhaust her administrative remedies as to her COVID-19 claims, it should deny her request for compassionate release because the BOP has taken appropriate measures to mitigate the risk of COVID-19 and because releasing the defendant from prison would undermine the sentencing goals set forth under 18 U.S.C. § 3553(a).

      Additionally, the defendant complains that Federal Medical Center Carswell is not the type of medical facility she should be in and that it is incapable of providing her with a re-

1

implantation surgery. However, this complaint about the conditions of her confinement does not meet the statutory requirements for compassionate release and should not be considered by the Court. Nor is this complaint supported by the defendant's medical records.

### I.     The Defendant has Failed to Exhaust her Administrative Remedies Regarding COVID-19

The defendant did not raise COVID-19 in the request for compassionate release that she submitted to the Bureau of Prisons ("BOP") on November 18, 2019, which was rejected, appealed twice, and rejected again twice. [*See* Doc. # 117 at 27-36]. In her request to BOP, which was submitted only five months after her self-surrender to Federal Medical Center Carswell ("FMC Carswell"), the defendant asserted that BOP could not provide an orthopedic specialist capable of re-implanting an artificial hip joint[1] and that she should be released from prison so that she could seek out a specialist at the Mayo Clinic in New York to perform her surgery. [Doc. # 117 at 35-36]. On December 13, 2019, Warden Carr denied the defendant's request for compassionate release, explaining that she did not meet the criteria based on her medical circumstances because "[a] review of your medical status indicates, that although you may require a wheelchair at times for mobility, you are able to complete all self-care activities

---

[1] The defendant's medical records do not support this claim. The notes of her orthopedist, Dr. Sanchez, from July 8, 2019, and September 9, 2019, show that he was monitoring the defendant's progress in remaining infection free prior to scheduling any surgery. [Ex. 3 at 5-6]. On September 9, 2019, Dr. Sanchez determined that the defendant should not have surgery for twelve months following her last surgery in March 2019. [*Id.* at 6]. Per his notes, the defendant agreed with this plan. [*Id.*]. While Dr. Sanchez noted the defendant's high risk of re-infection in light of her history of infections, his notes do not support the defendant's assertion that Dr. Sanchez expressed a lack of confidence in his ability to competently perform the required surgery. [*Id.*]. Notably, the defendant's medical records also show that she told her physical therapist on August 12, 2019, *i.e.* only two months after arriving at FMC Carswell, that she did not want to have any surgery while she was incarcerated. [*Id.* at 11]. The defendant's arguments regarding BOP's purported lack of ability to provide appropriate medical care appear to be driven by her own biases rather than facts.

independently." [Doc. # 177 at 35].

The defendant never submitted a new request for compassionate release to address her concerns regarding COVID-19. Thus, the defendant has failed to exhaust her administrative remedies as to the primary claim she has presented to the Court, and the Court does not have jurisdiction to consider that claim.

The Court may modify a defendant's term of imprisonment only after the defendant "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of thirty days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Proper exhaustion necessarily requires the defendant to present the same factual basis for the compassionate release request to the warden. Indeed, 28 C.F.R. § 571.61, which outlines the process for submitting a § 3582(c)(1)(A) request to the warden, requires the request to contain, "at a minimum . . . [t]he extraordinary or compelling circumstances that the inmate believes warrant consideration." Administrative exhaustion is critical to ensure that the BOP, which has the most accurate and direct information regarding COVID-19 in its facilities, has the opportunity to act.

Ms. McClaflin encourages the Court to find that Section 3582(c)(1)(A)'s exhaustion requirement is non-jurisdictional. [Doc. # 117 at 20]. However, the vast majority of courts to have considered the issue "conclud[ed] that a failure to satisfy 18 U.S.C. § 3582(c)(1)(A)'s filing requirements bars defendants from filing motions for compassionate release, and that the judiciary has no power to craft an exception to these requirements for defendants seeking release during the COVID-19 pandemic." *United States v. Rabadi*, 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020) (collecting cases). When a defendant fails to satisfy Section 3582(c)(1)(A)'s

3

exhaustion requirement, a court is "without jurisdiction to entertain [the defendant's] request for compassionate release." *United States v. Perry*, 2020 WL 1676773, at *1 (D. Colo. Apr. 3, 2020) (quoting *United States v. Keith*, 2019 WL 6617403, at *1 (W.D. Okla. Dec. 5, 2019)); *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (concluding that failure to satisfy exhaustion requirement "presents a glaring roadblock foreclosing compassionate release").

## II.   The BOP's Response to COVID-19

In response to the COVID-19 pandemic, BOP has taken significant measures to protect the health of the inmates in its charge, which is one of its highest priorities. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities, including at the defendant's facility. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis. [*See* BOP

4

Memos at Exs. 1 & 2]. Under the phase of the Action Plan currently in effect, only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure, risk factors, and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended until at least June 30, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also

suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and

inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

### Additional Facts Specific to FMC Carswell

Currently, FMC Carswell has no cases of COVID-19. [Ex. 4 (Declaration of Raul Campos) at ¶ 28]. Previously, one inmate at FMC Carswell died as a result of COVID-19, and another tested positive and has since recovered. *See* www.bop.gov/coronavirus/. Both inmates were isolated, and the inmate who has recovered remained in isolation until she had two negative tests for COVID-19. [Ex. 4 at ¶ 28].

FMC Carswell is an accredited medical facility that provides nursing care, behavioral modification and ambulatory care. [*Id.* at ¶¶ 3-4 & 25]. It is not an inpatient hospital. Within BOP, patients are assigned four different levels of care. Care Level 1 is the lowest level of care required, and Care Level 4 is the highest level of care required.[2] When the defendant first arrived at FMC Carswell on June 11, 2019, she was designated as a Care Level 4. [*Id.* at ¶ 27]. On October 9, 2019, she was moved to a general population housing and her medical care level was changed to Care Level 2. [*Id.*].

To date, FMC Carswell has reviewed all of its Care Level 4 inmates for eligibility for priority consideration for home confinement under the CARES Act and the Barr memoranda. [*Id.* at ¶ 25]. Because the defendant's current medical condition does not warrant a Care Level 4 designation, she was not a part of this priority group.

### III.   The Defendant's Medical Claims Relating to COVID-19

In her motion, the defendant alleges that she suffers from an autoimmune disorder and

---

[2] For more information about care level designations, see ww.bop.gov/foia/docs/medicalclassificationguidelines.pdf.

7

that she is a former smoker.[3]  [Doc. # 117 at 1-2].  In reviewing the defendant's medical records, the government has seen no documents supporting the defendant's claim that she suffers from an autoimmune disorder or that she is generally immunocompromised.  There are repeated references in her medical records to her history of bacterial infections relating to her hip replacement surgeries.  For this reason, she was seen by an infectious disease specialist on September 6, 2019.  [Ex. 3 at 7-10].   But it does not appear that any further or broader diagnosis about being immunocompromised has been made.  [*Id.*].  Nor was any concern about the defendant supposedly being immunocompromised noted when she was isolated and treated for flu-like symptoms from February 27-March 2, 2020. [Ex. 3 at 21-30].  Her medical records regarding this incident reference her history of COPD, but they do not mention her being immunocompromised.  [*Id.*].  You would expect to see such a reference in these notes if such a diagnosis truly existed.  [Id.].  The defendant recovered from these flu-like symptoms by March 2, 2020.  [Id. at 29-30].

While not referenced it in her motion, the defendant was diagnosed with COPD on December 5, 2019.  [*Id.* at 2].  COPD is a risk factor that the CDC has identified with respect to COVID-19.  Her COPD is likely related to the defendant's self-reported history of being a former smoker.

### IV.     The Court Should Deny Defendant's Request for a Reduction in Sentence

Under the First Step Act, the Court may grant the defendant's motion for reduction of sentence "if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).  The proposed sentencing reduction must he

---

[3] The defendant also asserts that she has hypothyroidism.  Her medical records confirm this condition, but it is controlled by medication.  [Ex. 3 at 1].  And it is not a COVID-19 risk factor.

8

consistent with "the factors set forth in section 3553(a)." *Id.* In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (unpublished). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (unpublished) (citations omitted).

Currently, the Department of Justice is taking the position that the presence of a COVID-19 risk factor that is confirmed by BOP medical records meets the threshold requirement of presenting an "extraordinary and compelling" reason under the First Step Act.[4] However, the Department of Justice is not taking the position that the mere satisfaction of this threshold requirement should result in the granting of compassionate release. Instead, the Court should balance the precautions that the BOP is taking to mitigate the risk of COVID-19, the danger of releasing the defendant to the community, and the sentencing factors set forth under 18 U.S.C. § 3553(a).

Even where a defendant meets the threshold conditions for compassionate release, the decision to grant or deny a request for reduction in sentence remains discretionary. *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) ("There is no

---

[4] The law does not require the Court to agree with the Department of Justice's position. *See e.g., United States v. Korn*, 2020 WL 1808213, at *6-8 (W.D.N.Y. Apr. 9, 2020) (coronary artery disease did not amount to an extraordinary and compelling reason); *United States v. Roberts*, 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020) (denying to compassionately release HIV-positive defendant housed at New York City's Metropolitan Correctional Center (MCC), which had 10 confirmed COVID-19 cases – four inmates and six staff – as of the date of the court's opinion); *United States v. Hays*, 2020 WL 1698778 (S.D. Ala. Apr. 7, 2020) (holding concerns about contracting COVID-19 based on defendant's age, anemia, and allegedly unsanitary conditions at her facility were not extraordinary and compelling reasons justifying her release); *United States v. Clark*, 2020 WL 1557397, at *1 & *4 (M.D. La. Apr. 1, 2020) (defendant's high blood pressure and high cholesterol are not serious medical conditions and "the fear of contracting a communicable disease" proves insufficient to justify a sentence modification).

constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence.").

Here, the Court should deny the defendant's request because of the effective measures that BOP has taken to mitigate the risk of COVID-19, and because the sentencing factors under Section 3553(a) compel that the defendant's request be denied. *See e.g.*, *United States v. Israel*, 2019 WL 6702522, at *2 (S.D.N.Y. Dec. 9, 2019) (unpublished) (even accepting as true that the defendant was "severely disabled by incurable and progressive medical conditions, and that his condition has worsened substantially since he was originally incarcerated" compassionate release was denied due to the severity of the criminal conduct involving a massive Ponzi scheme: "[I]t would make a mockery of the sentencing statute if this financial fraudster, who ruined the lives and finances of hundreds of people while living the high life of an ostensibly successful hedge fund manager, were to be have his sentence reduced.").

From 2011 through 2017, the defendant engaged in a massive real estate fraud investment scheme resulting in a loss to investors of $14,528,206.39. [Doc. # 11 at 8-11; Doc. # 52 at 6]. During her fraud scheme, McClaflin represented to investors that her company, Homesource, could purchase distressed houses that were deeply discounted. [Doc. # 11 at 8]. McClaflin further represented that Homesource then had the following three exit strategies to profit from the distressed house: (1) sell it within 30 days for an immediate profit; (2) "fix and flip" the house for sale within 31-90 days; or (3) fix the house and rent it if the house fails to sell within 90 days. [*Id.*]. McClaflin falsely represented that each property would be financed by an individual investor whose investment would be secured by a Deed of Trust in first position on that property. [*Id.*]. McClaflin promised that investors would receive an interest rate of 6% to 15%. [*Id.* at 9].

However, starting in late March 2011, McClaflin intentionally began having multiple investors "invest" in the same property and began placing multiple Deeds of Trust on the same properties such that the amount of the investments purporting to be secured by the Deeds of Trust exceeded the value of the property. [*Id.*]. Starting in late March or April 2011, McClaflin intentionally did not record all of the investors' Deeds of Trust as promised. [*Id.*]. Nonetheless, McClaflin continued to falsely represent that investors would receive a first Deed of Trust and that McClaflin would record that Deed of Trust for the investor. [*Id.*]. McClaflin also sometimes forged the signature of an investor, without the investor's knowledge or consent, on a release so McClaflin could remove that investor's Deed of Trust from a property. [*Id.*].

Beginning in at least early 2013, Homesource's debt had grown too high and the interest payments owed to investors far exceeded the gross profits earned by Homesource. [*Id.*]. By January 2013, McClafflin was aware of this problem and intentionally continued seeking additional investments through 2017 so that she could keep making the interest payments owed to earlier investors. [*Id.*]. Unbeknownst to the individual investors, the amount of investment funds, which were supposed to be secured by real property, far exceeded the value of the encumbered property and Homesource's business assets. [*Id.* at 10].

Releasing the defendant from prison after serving only 12 months of her 96-month sentence would undermine the public's confidence in the criminal justice system and would re-traumatize the victims in this case. Additionally, a sentence of 12 months would not reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate general or specific deterrence.

For the foregoing reasons, the United States respectfully requests that the Court deny the defendant's motion.

### V. If the Court Grants Release, It Should Provide for a 14-Day Quarantine of the Defendant Prior to Release to Protect Public Health.

Should the Court grant release, the government requests that it accommodate the need to quarantine the defendant for a period of at least 14 days in order to protect public health. The government further requests that the Court retain jurisdiction over the motion for 14 days if it makes a determination to grant release, while advising the parties of that decision. BOP will then place the inmate in quarantine. If the defendant has not displayed symptoms or tested positive for COVID-19 for a period of 14 days, the Court may then order release. If the defendant tests positive during the initial 14-day period, the government will notify the Court and seek an extension of the release date until the defendant has tested negative.

Respectfully submitted this 15th day of June, 2020.

JASON R. DUNN
United States Attorney

By: */s/ Pegeen D. Rhyne*
Pegeen D. Rhyne
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0409
E-mail: Pegeen.Rhyne@usdoj.gov
Attorney for the United States

## **CERTIFICATE OF SERVICE**

      I certify that on this 15th day of June, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case

      By: *s/Kayla Keiter*
      Legal Assistant for AUSA Pegeen D. Rhyne
      United States Attorney's Office