## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 17-cr-00168-CMA-1

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KAREN LYNN McCLAFLIN,
    Defendants.

_____

### DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR
### COMPASSIONATE RELEASE OR HOME CONFINEMENT
_____

Defendant Karen McClaflin, through counsel, respectfully submits this Reply in Support of Motion for Compassionate Release or Home Confinement:

    1.    <u>INTRODUCTION</u>:    On June 5, 2020, Defendant filed her Pro Se Motion for Compassionate Release or Home Confinement Per the Care and First Step Acts. [Doc.117]. This Court has previously observed that *pro se* pleadings should be reviewed liberally and held to a less stringent standard than those drafted by an attorney. See e.g. *Hutchinson v. Milyard*, 2011 U.S. Dist. LEXIS 743 (2011). On June 15, 2020, the Probation Office's Response [Doc.121] and the Government's Response to Defendant's Motion for Compassionate Release [Doc. 122] were filed. Ms. McClaflin, through counsel, now submits this Reply.

    2.    <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>:    The government first responds by claiming that Ms. McClaflin has failed to exhaust administrative

1

remedies. The government claims that "the defendant never submitted a new request for compassionate release to address her concerns regarding COVID-19." [Doc.122, p.3]. In fact, she has. The history of Ms. McClaflin's efforts to exhaust administrative remedies is detailed and documented in her *pro se* motion. Ms. McClaflin filed separate requests for an administrative remedy on November 18, 2019 and January 27, 2020 based on her medical condition. [Doc.117, pp.33, 35-36]. These requests for administrative remedy did not specifically cite the COVID-19 pandemic as grounds for relief. However, on June 1, 2020, Ms. Claflin submitted a third request for administrative remedy which specifically noted that she was at extraordinary risk to contract COVID-19 with potential catastrophic consequences. [Doc. 117, pp.25-26 (Attachment to BP-9)]. More than thirty (30) days have now passed since June 1, 2020 when Ms. McClaflin submitted her third request for administrative remedy.

18 U.S.C. §3582(c)(1)(A) provides that a motion for compassionate release can be filed after the lapse of 30 days from the date a request for administrative remedy is received by the warden of the defendant's facility. Ms. McClaflin is not certain of the date that her third request was received by the warden; however, she does know that the request was submitted on June 1, 2020. More than 30 days have passed since Ms. McClaflin requested an administrative remedy based on concerns about COVID-19. Accordingly, Ms. McClaflin's submits that her requests for administrative remedy are ripe for review by this Court.

Counsel is aware that this Court has consistently held that exhaustion is a jurisdictional requirement for the Court to entertain a request for compassionate release.

See e.g. *United States v. Soto*, 16-cr-238-CMA (April 15, 2020); *United States v. Riley*, 17-cr-134-CMA (April 17, 2020); *United States v. Ramirez-Argueta*, 14-cr-427-CMA (May 29, 2020); *United States v. Maynard*, 18-cr-395-CMA (May 15, 2020).  In these cases the Court found a failure to exhaust based on (1) the record being "devoid" of any evidence of an attempt to comply with administrative exhaustion requirements (*Ramirez-Argueta*, *Soto*); (2) the defendant conceded a failure to exhaust (*Riley*); or (3) the defendant "provide(d) no direct evidence" of exhaustion (*Maynard*).  Unlike these cases, Ms. McClaflin has provided direct evidence of exhaustion. [Doc. 117, pp.25-26 (Attachment to BP-9)].

      3.     <u>MS. McCLAFLIN'S MEDICAL CONDITION AND VULNERABILITY TO COVID-19</u>:   Ms. McClaflin's medical records confirm that she is especially vulnerable to COVID-19.  The Center for Disease Control and Prevention website states the following: "People of any age with the following conditions **are at increased risk** of severe illness from COVID-19: COPD (chronic obstructive pulmonary disease)." See Exhibit A, print-out from CDC website (emphasis in original on CDC website).[1]  Ms. McClaflin has Chronic Obstructive Pulmonary Disease. [Doc. 122-3, pp.2, 26].  Whether or not, as the U.S. Attorney opines, Ms. McClaflin's COPD is related to her history of being a smoker is irrelevant. [Doc. 122, p.5].   What is relevant is that (1) COPD creates

---

[1] Full document available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html

an "increased risk of severe illness from COVID-19", and (2) Ms. McClaflin has COPD.

While the etiology of Ms. McClaflin's COPD diagnosis is not relevant, her history of smoking is. As recently as last week the CDC updated its list of underlying medical conditions that increase a person's risk of severe illness from COVID-19 and noted that a history of smoking may create increased risk. See Exhibit B.[2]

The government argues that Ms. McClaflin's request for relief should be denied because, *inter alia*, the BOP medical records that the government attached to its Response do not note a diagnosis of autoimmune disorder. The extensive record that has previously been made in this case regarding Ms. McClaflin's medical condition should not be ignored. [Docs. 26, 36, 55, 65, 87, 93, 99, 107, 108, 109][3]. The record in this case is replete with documentation that Ms. McClaflin has a history of "chronic", "acute", "recurrent" infections. One medical report in the Court file describes Ms. McClaflin as "relatively frail and in a weakened state" and as being in a "physically deconditioned and weakened state." [Doc.36].

Further, a report relied on by the CDC when it updated the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19 (Exhibit B, pp.2,5) states as follows: "Smoking . . . increase(s) risk and severity of

---

[2] From CDC website at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html.

[3] In addition to these court filings, on January 14, 2019 a hearing was held in this matter and the Court received testimony from two medical professionals. [Doc. 81]. The Court file does not include transcript of the hearing. Accordingly, counsel is unable to comment of the substance of the testimony; however, counsel suspects that Ms. McClaflin's long-standing heath issues were discussed.

pulmonary infections because of damage to upper airways and **a decrease in pulmonary immune function**."[4] The report further states, "our analysis confirms that smoking is a risk factor for progression of COVID-19, with smokers having 2.25 times the odds of severe COVID-19 outcomes that never smokers. . . . The finding that smoking is associated with COVID-19 progression is not surprising because of the **adverse effects of smoking on pulmonary immune function**."  In short, smoking causes immunodeficiency.  This is not a novel medical concept or a recent discovery, see *e.g.* Bauer, CMT, *et al*, The Influence of Cigarette Smoking on Viral Infections, available at https://doi.org/10.1378/chest.12-0930 ("cigarette smoke **profoundly** affects the immune system, compromising the host's ability to mount appropriate immune and inflammatory responses. . ."(emphasis added)).

It is also noteworthy that Ms. McClaflin's medical records document that she suffers from "Renal insufficiency" [Doc. 93, p.3] and that the CDC states that there is strong and consistent evidence that "chronic kidney disease" increases a person's risk of severe illness from COVID-19.  Exhibit B.

Unquestionably, Ms. McClaflin suffers from a medical condition(s) identified by the CDC as putting her at a higher risk of serious illness from COVID-19.  Recently, the Department of Justice has taken the position that inmates who suffer from a condition identified by the CDC as putting them at higher risk for severe illness from COVID-19 and

---

[4] Patanavanich, R and Glantz, S, Smoking is Associated with COVID-19 Progression: A Meta-Analysis, available at: https://www.medrxiv.org/content/10.1101/2020.04.13.20063669v1.

-5-

who are not expected to recover from that condition, present an "extraordinary and compelling reason" to be considered for compassionate release under U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(I)—even if that condition in ordinary times would not meet the terms of the policy statement. *See, e.g.*, Letter Amending Government's Response, *United States v. Wise*, 1:18-cr-00072-ELH, ECF 185 (D. Md. May 18, 2020) ("consistent with current DOJ policy, the Government does not contest the Defendant's eligibility for being considered for compassionate release in this case because he suffers from a condition identified by the CDC as putting him at higher risk for severe illness."); *see also* Government's Response, *United States v. Feucht*, 0:11-cr-60025, ECF 51, p.5 (S.D. Fla. May, 26, 2020) ("The Government acknowledges that during the current COVID-19 pandemic, an inmate who presents one of the CDC risk factors, which include diabetes, as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason that would allow compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release."); Government's Response to Defendant's Motion for Compassionate Release, *United States v. Moralez*, 1:13-cr-00073-SWS, ECF 50, p.3 (D. Wyo. May 27, 2020) ("The Department of Justice takes the position that the mere existence of COVID-19 is not sufficient to qualify an inmate for compassionate release. However, if an inmate has a chronic health condition that makes him particularly vulnerable to serious illness from COVID-19, as determined by the CDC, then the Department would deem he has satisfied the pertinent criteria in Application Note 1(A)(ii)(I).").

    4.    <u>MEASURES TAKEN BY THE BOP TO MITIGATE THE RISKS OF COVID-19</u>:    The government claims that the BOP has taken appropriate measures to mitigate the risks of COVID-19. To support this assertion the government relies, *inter alia*, on a Declaration from the Associate Warden at FMC Carswell, Raul Campos. [Doc.122-4]. Several statements in Mr. Campos' Declaration are noteworthy.

The Campos Declaration states, "As of today's date, there are currently no inmates or staff with active COVID-19 at FMC Carswell." [*Id.*, ¶28]. Having no evidence to the contrary, the Defendant will accept that this statement was accurate when written; however, it is no longer true. According to the BOP's own website, as of this morning, there are 24 confirmed active case of COVID-19 at FMC Carswell (23 inmates and 1 staff). **This represents a 2,300% increase of confirmed active cases at FMC Carswell in the past week.** The percentage increase based on numbers from Mr. Campos' Declaration is incalculable. Further, because of the BOP's testing protocol, little confidence can be placed in the BOP's reporting of confirmed active cases of COVID-19 at FMC Carswell. According to the BOP's procedures, "symptomatic inmates" are tested for COVID-19. See Exhibit C, p.2, BOP Implementing Modified Operations.[5] The current best estimate from the CDC is that 35% of persons infected with COVID-19 are asymptomatic with possible asymptomatic infections ranging from

---

[5] BOP Modified Operations available at https://www.bop.gov/coronavirus/covid19_status.jsp.

20% to 50%.  See Exhibit D, CDC COVID -19 Pandemic Planning Scenarios.[6] Accordingly, because a high percentage of persons infected with COVID-19 are asymptomatic but only symptomatic inmates are tested, the number of active cases reported by FMC Carswell is of limited value.  In any event, the staggering increase of confirmed COVID-19 infections at FMC-Carswell leaves no doubt that the BOP's efforts to mitigate the risks of COVID-19 are largely ineffective.

Mr. Campos reports on two inmates at FMC Carswell who had COVID-19.  Regarding the first of those inmates Mr. Campos reports that "she was housed in quarantine and isolation the entire time she was at FMC Carswell." [Doc.122-4, ¶28].  What Mr. Campos does not say it that this inmate's "entire time" at FMC Carswell was extremely short because she died from COVID-19.  Commendably the government's response does include this inconvenient fact that apparently slipped Mr. Campos' mind.

Mr. Campos also reports that "FMC Carswell has reviewed all of its Care Level 4 inmates for eligibility for priority consideration for home confinement under the CARES Act and the Barr memoranda."  [Doc.122-4, ¶26].  Mr. Campos neglects to point out that Ms. McClaflin was not included in this review.  Again, the government's response does report that Ms. McClaflin was not included in this review but does so by suggesting that she isn't really all that sick. [Doc. 122, p.7].

Mr. Campos also suggests that Ms. McClaflin will be safer at FMC Carswell,

---

[6] CDC report available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.  In this report the CDC also estimates that the infectiousness of asymptomatic individuals relative to symptomatic individual is 100%.

where one inmate has already died from COVID-19 and where there has been a 2,300% increase in confirmed cases in the last week, than she would be at home serving her sentence in home confinement. [Doc.122-4, ¶6]. To be blunt, this suggestion is preposterous and was rejected by Judge Raymond Jackson in the Eastern District of Virginia:

> Despite the BOP's protection measures, individuals housed in prisons remain particularly vulnerable to infection. Even in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others. Thus, the Court need not wait until an outbreak occurs to determine whether to release Petitioner, especially whereas here, Petitioner suffers from underlying health conditions that may become fatal if she contracts COVID-19.

*Benn v. United States*, E.D.VA, Case No. 2:17-cr-30, ECF 122, PageID# 711 (internal citations and quotations omitted).

In Reply to the government's claim that the BOP has taken appropriate measures to mitigate the risks of COVID-19, Ms. McClaflin invites the Court's attention to a letter from Regina Warren, the President of AFGE Local 1006 to Senator John Cornyn, attached hereto as Exhibit E. According to Ms. Warren, and contrary to the assurances from the BOP, in addressing COVID-19 "FMC Carswell knowingly and willingly misled the public placing the staff, inmates, and community at risk to the most lethal pandemic since 1920."

     5.    <u>The Legal Standard for Relief</u>:    Pursuant to the First Step Act, 18 U.S.C. 3582(c)(1)(A), a court may modify a term of imprisonment, "after considering the factors set forth in section 3553(a) to the extent they are applicable," if (a) "extraordinary and

compelling reasons warrant" relief and (b) relief is "consistent with applicable policy statements issued by the Sentencing Commission." The Sentencing Commission has provided an expansive definition of "extraordinary and compelling reasons" at U.S.S.G. §1B1.13, note 1. The definition has three general categories of "extraordinary and compelling reasons" (medical condition, age and family circumstances) but also includes a "catch-all provision" that allows a finding of "extraordinary and compelling reasons" on other grounds. The Sentencing Guidelines also provide that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing." *Id*, note 2.

Here, Ms. McClaflin has made a showing of extraordinary and compelling reasons to grant relief. She has been diagnosed with an underlying medical condition (COPD) that increases her risk of severe illness from COVID-19. Additionally, her history as a smoker, standing alone, not only increases her risk from COVID-19, but also, "decreases her pulmonary immune function." "Renal insufficiency" further increases her risk. On top of all this, the chronic issues surrounding Ms. McClaflin's hip replacement and resulting infections remain unresolved. The fact that her hip replacement issues were known at time of sentencing does not preclude consideration of those facts in finding "extraordinary and compelling" reasons to grant relief. In the age of COVID-19, it is "extraordinary and compelling" that Ms. McClaflin has COPD, renal insufficiency, is a smoker with the attendant consequences, has significant unresolved medical issues, and is housed in a facility where infections are increasing at an alarming rate and a fellow inmate has already died from COVID-19. Further, Ms. McClaflin will not pose a danger to the safety of any other person or to the community and relief is consistent with applicable policy statement

issued by the Sentencing Commission.

The requested relief is consistent with Section 3553(a) factors. In considering Ms. McClaflin's motion the Court is directed to consider the sentencing factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. §3582(c)(1)(A). Ms. McClaflin will not attempt to relitigate the §3553(a) factors that were thoroughly discussed at the sentencing hearing; however, §3553(a) factors remain relevant and additional pertinent information has become available. As the Court is aware, Ms. McClaflin worked diligently to assist in locating assets that could be returned to the victims. Indeed, because of her cooperation and assistance, the government filed a motion requesting a variant sentence. [Doc.20]. We are happy to report that Ms. McClaflin's efforts have been successful. Attached hereto as Exhibit F, is a letter from James Barash who was appointed receiver by the El Paso County District Court to pursue assets that could be returned to victims. Mr. Barash reports that to date the Receiver has recovered over $9.2 million for the estate and has distributed over $5 million to secured claimants and over $1.6 million to unsecured claimants. Secured claimants have received a 100% return of principal. As the Court well knows, this sort of recovery for victims of white-collar crime is extraordinary. These recoveries are in no small measure the result of Ms. McClaflin's efforts. Mr. Barash reports that he continues to pursue assets that can be returned to the victims and that, if transferred to home confinement, Ms. McClaflin could assist in those efforts.

6.  <u>Relief Requested</u>:  Ms. McClaflin's request is that she be permitted to serve her sentence in home confinement. If sentenced to home confinement she would

-11-

(1) be relatively more safe from exposure to COVID-19 than she will be in the custody of the BOP; (2) be able to receive necessary medical care more effectively and efficiently (see §3553(a)(2)(D) ; and (3) be able to assist the court appointed Receiver in pursuing assets for the benefit of victims.

Despite Ms. McClaflin's wishes, this Court likely lacks the authority to order that she be transferred to home confinement.  Pursuant to 18 U.S.C. §3586 and §3621(b), the BOP, and not this Court, has the authority to choose the place of defendant's incarceration.  18 U.S.C. 3621(b) provides that "[t]he Bureau of Prisons shall designate the place of the prisoner's imprisonment."  "The term 'imprisonment' refers to any type of custody, including custody in a correctional facility or home confinement program." *Moresco v. United States*, 982 F.2d 529, [published in full-text format at 1992 U.S. App. LEXIS 32819, 1992 WL 372399 (10th Cir. 1992)). Thus, the decision as to defendant's placement rests with the Bureau of Prisons. The Court is without jurisdiction to order how defendant's sentence is to be administered. *Id; United States v. Samuels,* 2019 U.S. Dist. Lexis 144787 (W.D.Ok. 2019).  Accordingly, defendant's understanding is that this Court does not have the authority to order that Ms. McClaflin's sentence be served in home confinement.  That said, this Court does have the statutory authority to accomplish a similar result.  18 U.S.C. 3582(c) gives this Court the legal authority.

18 U.S.C. 3582(c), provides that this Court "may modify a term of imprisonment" and "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment."  18 U.S.C. 3563(b)(19) specifically authorizes home confinement as a condition of

probation. 18 U.S.C. 3583(d) gives the Court broad authority to impose conditions of supervised release:

> The court may order, as a further condition of supervised release, to the extent that such condition—
>
> **(1)** is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D) [18 USCS § 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D)];
>
> **(2)** involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D) [18 USCS § 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D)]; and
>
> **(3)** is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a);
>
> any condition set forth as a discretionary condition of probation in section 3563(b) [18 USCS § 3563(b)] and any other condition it considers to be appropriate.

In addition to its authority to order home confinement as a condition, this Court has the authority to order "any other condition it considers to be appropriate." Accordingly, the Court could, if it considered it appropriate, place Ms. McClaflin on location monitoring. Further, although it probably goes without saying, Ms. McClaflin would be under the supervision of the Probation Office and this Court would retain the authority to place her back in BOP custody should she violate any condition of probation or supervised release.

7. <u>Conclusion</u>: Based on the foregoing, Defendant respectfully request that this court find that "extraordinary and compelling reasons" exist to modify the sentence in

this case and order that:

    a. Her term of imprisonment be modified to time served with a term of supervised release, with conditions that the Court deems appropriate, but including, home confinement;

    <u>OR</u>,

    b. Her sentenced be modified to a term of probation, with conditions that the Court deems appropriate, but including, home confinement.

DATED:   July 3, 2020.   Respectfully submitted,

NATHAN D. CHAMBERS LLC
By:   s/Nathan D. Chambers
Nathan D. Chambers
303 16th Street, Suite 200
Denver, Colorado 80202
(303) 825-2222

-15-

## CERTIFICATE OF SERVICE

  I hereby certify that on July 3, 2020, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.

             By:   s/Nathan D. Chambers
             Nathan D. Chambers
             303 16th Street, Suite 200
             Denver, Colorado 80202
             (303) 825-2222